**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| THE HONORABLE KAREN WELDIN STEWART, CIR-ML, INSURANCE COMMISSIONER OF THE STATE OF DELAWARE, IN HER CAPACITY AS THE RECEIVER OF SECURITY PACIFIC INSURANCE COMPANY, INC. IN LIQUIDATION, SPI-202, INC. IN LIQUIDATION, SPI-203, INC. IN LIQUIDATION, and SPI-204, INC. IN LIQUIDATION, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 9306-VCP |
| v. | ) ) | |
| WILMINGTON TRUST SP SERVICES, INC., JOHNSON LAMBERT & CO., LLP, JOHNSON LAMBERT, LLP, McSOLEY McCOY & CO., JAMES M. JACKSON, PAUL D. KING, KEVIN R. DAVIS, and STEPHEN D. KANTNER, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**OPINION**

Date Submitted: November 20, 2014
Date Decided: March 26, 2015

Diane J. Bartels, Esq., Wilmington, Delaware; Jeffrey B. Miceli, Esq., BLACK & GERNGROSS, P.C., Philadelphia, Pennsylvania; *Attorneys for Plaintiff The Honorable Karen Weldin Stewart, CIR-ML, Insurance Commissioner of the State of Delaware, in her Capacity as the Receiver of Security Pacific Insurance Company, Inc. in Liquidation, SPI-202, Inc. in Liquidation, SPI-203, Inc. in Liquidation, and SPI-204, Inc. in Liquidation.*

C. Malcolm Cochran, IV, Esq., Chad M. Shandler, Esq., Blake Rohrbacher, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendants Wilmington Trust SP Services, Inc. and Stephen D. Kantner.*

Kevin A. Guerke, Esq., SEITZ VAN OGTROP & GREEN P.A., Wilmington, Delaware; Kevin M. Murphy, Esq., Alexander M. Gormley, Esq., CARR MALONEY P.C., Washington, D.C.; *Attorneys for Defendants Johnson Lambert & Co. LLP and Johnson Lambert LLP*.

John D. McLaughlin, Jr., Esq., CIARDI CIARDI & ASTIN, LLC, Wilmington, Delaware; Jonathan S. Ziss, Esq., Seth L. Laver, Esq., GOLDBERG SEGALLA LLP, Philadelphia, Pennsylvania; *Attorneys for Defendant McSoley McCoy & Co*.

**PARSONS, Vice Chancellor.**

The key issue in this Opinion is when, under Delaware law, a corporation may state claims against third parties, like auditors, who are implicated in the alleged misconduct of the corporation's directors and officers. The plaintiffs here are four Delaware-domiciled captive insurance companies, with the Insurance Commissioner of the State of Delaware prosecuting their claims as their receiver in liquidation. The complaint alleges an array of fraudulent conduct on the part of the four companies' president, CEO, and sole stockholder. The other directors of the corporations also are alleged to have breached their fiduciary duties by either assisting or failing to catch and report those fraudulent acts.

As relevant here, the complaint also includes claims against the companies' auditors and their administrative management company for breaches of fiduciary duty, breach of contract, negligence, and aiding and abetting breaches of fiduciary duty. Those defendants moved to dismiss, contending that the wrongdoing of the companies' officers and directors is imputed to each of the corporations themselves, and that the doctrine of *in pari delicto* bars the court from intervening to adjudicate claims between wrongdoers. In addition, the moving defendants seek dismissal of the claims against them based on the defense of laches and for failure to allege the necessary elements of certain of the putative causes of action. The receiver disputes the applicability of these defenses and denies that *in pari delicto* should bar her claims for several different reasons.

I first conclude that Delaware law governs the entirety of the pending motions. Next, I reject the moving defendants' laches defense as without merit in the circumstances of this case. After that, I briefly address the motions of the auditors, the

administrative management company, and its defendant-employee to dismiss the various claims for breach of fiduciary duties. I grant this aspect of the motions as to those defendants, except the defendant-employee who was a director of the plaintiff insurance companies. I then take up the issue of whether *in pari delicto* requires dismissal of the remaining claims.

For the reasons stated in this Opinion, I conclude that *in pari delicto* does apply in this case, and that it effectively would bar the relevant claims against the moving defendants, unless I found applicable one of the exceptions urged by the receiver. In the circumstances of this case, the well-known "adverse interest" exception does not apply. The receiver also contends that the Court should set aside the *in pari delicto* doctrine on public policy grounds tied to the specific concerns involved in the insurance receivership context. But, I conclude that the facts of this case do not support such a result.

Finally, I address the argument that Delaware law should recognize an "auditor exception" to the *in pari delicto* rule, as some states have done. Because I do not read the applicable Delaware cases as supporting the conclusion the receiver urges, and I am not convinced that Delaware public policy would be well-served by a broad auditor exception, I reject that argument as it relates to the claims for breach of contract and negligence and dismiss those claims on grounds of *in pari delicto*. I decline to dismiss the claims for aiding and abetting a breach of fiduciary duty on that basis, however, because I conclude, based on Delaware case law and the relevant policy concerns, that the well-established "fiduciary duty" exception to *in pari delicto* would cover those claims.

2

Finally, I examine the aiding and abetting claims against each of the auditors and the administrative management company. Based on the allegations in the Complaint, I deny the motions to dismiss those claims, except as they relate to the auditor that was retained second.

## I. BACKGROUND[1]

### A. The Parties

This case concerns Security Pacific Insurance Company, Inc. ("Security Pacific"), SPI-202, Inc. ("SPI-202"), SPI-203, Inc. ("SPI-203"), and SPI-204, Inc. ("SPI-204," and collectively, the "SPI Entities"). All of the SPI Entities are Delaware corporations. From December 31, 2007, to June 15, 2011, they operated as Delaware-domiciled special purpose captive insurance companies.

On June 15, 2011, this Court entered an order in a related action placing the SPI Entities into liquidation pursuant to 18 *Del. C.* § 5906 (the "Liquidation Action").[2] Plaintiff in this action is the Honorable Karen Weldin Stewart, the Insurance Commissioner of the State of Delaware, who brings this action as Receiver of the SPI Entities in liquidation. The Complaint initially named eleven Defendants: Wilmington Trust SP Services, Inc. ("Wilmington Trust"); Johnson Lambert & Co., LLP; Johnson

---

[1] All facts recited herein are drawn from the well-pled allegations of Plaintiff's Verified Complaint (the "Complaint").

[2] *In re Liquid. of Sec. Pac. Ins. Co.*, C.A. No. 6317-VCP, at 17 (Del. Ch. June 15, 2011) (ORDER) (the "Liquidation Order"); *see also In re Liquid. of Sec. Pac. Ins. Co.*, C.A. No. 6317-VCP (Del. Ch. June 28, 2011) (the "Motion for Liquidation Transcript").

Lambert, LLP; McSoley McCoy & Co. ("McSoley McCoy"); Ryan Building Group, Inc. ("Ryan Building Group"); Kevin R. Davis; James M. Jackson; James L. Jackson; Stephen D. Kantner; Paul D. King; and Anthony P. Muñoz.[3]

As relevant to this Opinion, Wilmington Trust, a Delaware corporation with its principal place of business in Wilmington, Delaware, provided management and administrative services to the SPI Entities. Defendant Kantner, an individual residing in Delaware, was an employee of Wilmington Trust and also a member of the boards of directors of the four SPI Entities. Johnson Lambert & Co., LLP, is a South Carolina limited liability partnership based in South Carolina, and Johnson Lambert, LLP, is a Virginia limited liability partnership based in North Carolina (together, "Johnson Lambert").[4] As discussed in further detail below, Johnson Lambert and McSoley McCoy, a Vermont corporation with its principal place of business in Vermont, each provided certified public accountant and independent auditor services to the SPI Entities. Currently before the Court are motions to dismiss filed by Johnson Lambert and McSoley

---

[3] The Receiver voluntarily dismissed the claims against Ryan Building Group on April 10, 2014. As noted *infra* in Section I.C, I dismissed the Complaint as it relates to James L. Jackson and Anthony Muñoz on August 12, 2014.

[4] The Receiver alleges that Johnson Lambert & Co., LLP's rights, duties, and liabilities were assumed by Johnson Lambert, LLP in 2012. Compl. ¶ 14. Johnson Lambert asserts that the underlying company always has been the same; it simply changed its name from the former to the latter. Because this point is immaterial to the pending motions, I refer only to "Johnson Lambert" for the remainder of this Opinion.

McCoy (together, the "Auditor Defendants"), and by Wilmington Trust and Kantner (collectively, the "Moving Defendants").

## B. Facts

### 1. The SPI Entities

In 2005, Defendant James M. Jackson formed Security Pacific Insurance Company, Inc., as a captive insurance company incorporated in the District of Columbia ("SPIC-DC"). In general terms, a "captive insurance company" is a business entity formed as a subsidiary of a non-insurance parent company for the purpose of insuring the parent's business risk, or the risk of the parent's affiliates or customers. It is a self-insurance mechanism in which the insurer is wholly owned by the insured. In the State of Delaware, captive insurance companies, like all commercial insurers, are subject to extensive regulatory oversight and requirements, ranging from licensure and reporting to minimum capital and reserve thresholds.[5]

Jackson,[6] through a wholly owned holding company, was the sole owner of SPIC-DC. He also owned an insurance brokerage company, nonparty J. Mading Financial and Insurance Services, Inc. ("J. Mading"), which, in collaboration with SPIC-DC, designed and marketed insurance solutions using captive insurance companies. For example, Ryan Building Group, a client of J. Mading's, was insured by a subsidiary of SPIC-DC, and nonparty OOM, LLC was insured by another. Those two clients, which engaged in

---

[5]    *See generally* 18 *Del. C.* §§ 6901 to 6983.

[6]    Because Defendant James L. Jackson has been dismissed from this action, the use of the name "Jackson" in this Opinion refers to Defendant James M. Jackson.

5

residential construction, apparently entered into participation agreements by which SPIC-DC and its "cells," or subsidiary captives, would provide warranty reimbursement, general liability, property, excess, and environmental liability insurance coverage.

Beginning in July 2007, Jackson sought to re-domicile SPIC-DC and its subsidiary cells to Delaware. According to Jackson's plan, SPIC-DC would merge into Security Pacific, the Delaware corporation at issue in this case, and SPIC-DC's cells would merge into the newly incorporated SPI-202 and SPI-203 entities. SPI-204 would be created to insure the risk of Alexa Holding Company, LLC, another entity solely owned by Jackson. Pursuant to the relevant statutory provisions, Jackson submitted an application for authorization to the Delaware Department of Insurance ("DDOI"). In the application documents, Jackson represented that the SPI Entities would hold initial capital amounts, in the aggregate, of roughly $2.7 million, with some additional reserves in the form of letters of credit.[7] Included in these application documents were SPIC-DC's audited financial statements covering the time period from its inception in 2005 to December 31, 2006, which reported that SPIC-DC had total assets of roughly $4.8 million.[8] Those audited financial statements were prepared and certified by Johnson Lambert.

In October 2007, SPIC-DC entered into a Management Services Agreement (the "MSA") with Wilmington Trust, whereby Wilmington Trust agreed to serve as Security

---

[7]     According to the application documents, Jackson represented that Security Pacific, SPI-202, SPI-203, and SPI-204 would hold initial capital amounts, respectively, of $962,792; $639,051; $349,356; and $698,968. Compl. ¶¶ 63-67.

[8]     Compl. ¶¶ 68-69; *id*. Ex. B.

Pacific's "captive manager" in Delaware by providing administrative, compliance, and other related services.[9] Wilmington Trust also would ensure that the SPI Entities conformed with certain statutory requirements, by, for example, providing a "place of business" in Delaware, and retaining all of the SPI Entities' original documentation and books and records here.[10] Consistent with the legal requirements, Defendant Kantner, who was employed as an Accounting Supervisor at Wilmington Trust, served as a "resident" director on the boards of each of the SPI Entities.[11]

As relevant here, the captive management services provided by Wilmington Trust included bookkeeping, financial account reconciliation and review, and preparation of unaudited financial statements. In this regard, Wilmington Trust regularly reviewed information regarding the SPI Entities' bank accounts. The Complaint alleges that Jackson provided monthly financial statements for the relevant accounts via an online data link run through J. Mading.[12] The Complaint also avers that Jackson's position as the intermediary between Wilmington Trust and Bank of America, Wells Fargo, and Wachovia—the banks housing the SPI Entities' financial accounts—was critical to his fraudulent scheme.[13]

---

[9] *Id.* ¶¶ 71-80; *id.* Ex. C.

[10] 18 *Del. C.* §§ 6903(b), 6923.

[11] Compl. ¶¶ 74, 88.

[12] *Id.* ¶¶ 81-82.

[13] *Id.* ¶¶ 83-85.

7

In November 2007, SPIC-DC engaged Johnson Lambert to prepare audited financial statements for the calendar year ending December 31, 2007 (the "2007 Audited Financial Statements").[14] On December 31, 2007, the DDOI approved the SPI Entities' application for a certificate of authorization, contingent on satisfactory receipt of the 2007 Audited Financial Statements, and Security Pacific, SPI-202, SPI-203, and SPI-204 were incorporated in Delaware as special purpose captive insurance companies.

### 2.    The 2007 Audited Financial Statements are prepared and approved amidst irregularities

The allegations relating to the 2007 Audited Financial Statements span 120 paragraphs and over 40 pages of the Complaint. They describe in remarkable detail a process in which Wilmington Trust and Johnson Lambert, from February to December 2008, struggled to obtain the necessary confirmations to complete the audit. In the interests of brevity and clarity, I recount the well-pled facts relating only to the most significant areas of irregularity in this process. The first such area involved confirming the cash surrender value of a "key man" life insurance policy issued by Hartford Life and Annuity Insurance Company ("Hartford Life") in December 2005, which insured the life of Jackson for a face value amount of about $23.5 million (the "Key Man Policy").[15] That policy was owned by SPIC-DC, and its purported cash value comprised the bulk of the assets Security Pacific claimed in its application to the DDOI. The 2005 and 2006

---

[14]    *Id*. ¶ 89; *id*. Ex. D [hereinafter the "2007 Johnson Lambert Engagement Letter"].

[15]    *Id*. ¶¶ 64, 100, 103.

8

audited financial statements of SPIC-DC, prepared by Johnson Lambert, certified that the Key Man Policy had a cash value of $628,783 as of December 31, 2006. As discussed below, the audited financial statements for 2007, 2008, and 2009 continued to "confirm" the policy's cash value. In reality, the policy had lapsed in May 2006 and was worthless.

A second area in which Wilmington Trust and Johnson Lambert encountered difficulty in producing audited financial statements for the SPI Entities was confirming the cash and cash equivalents held in the several accounts they maintained at Bank of America, Wachovia Bank, Wachovia Securities, and Wells Fargo. As with the Key Man Policy, Johnson Lambert had confirmed the balances in these accounts in connection with the 2005 and 2006 audits of SPIC-DC.[16] By the time the Receiver took control of the SPI Entities in 2011, however, several of the bank accounts were basically empty, even though the 2007, 2008, and 2009 audits had "confirmed" that they had held several million dollars in the aggregate in those years.

### a. The Key Man Policy

The interactions between Jackson, Wilmington Trust, and Johnson Lambert in connection with the confirmation of the Key Man Policy exemplify the larger pattern of delay tactics, deception, and otherwise questionable conduct that the Receiver ascribes to Jackson. In February 2008, Johnson Lambert asked Allan Drost of Wilmington Trust to obtain from Jackson a full, signed copy of the Key Man Policy. Drost emailed Jackson, who responded that he would assemble the necessary documents later that same day.

---

[16] *Id.* ¶¶ 100-101.

Several months passed, however, without any follow-up from Jackson.[17] In early June 2008, Drost sent a series of confirmation forms to Jackson for him to sign and submit to Johnson Lambert. Around the same time, Drost advised Thomas Bolton of Johnson Lambert that Wilmington Trust intended to send a letter to the DDOI, advising it that the SPI Entities' audited financials were delayed, but would be provided by the end of July. Bolton agreed that that timeframe was not a problem.[18]

On July 23, 2008, Justine Holeman of Johnson Lambert received a letter from Hartford Life informing Johnson Lambert that, because the confirmation inquiry they had submitted to Hartford Life was not signed by Jackson, they had forwarded the requested information to Jackson rather than to Johnson Lambert directly.[19] On the same day, Hartford Life sent Jackson a letter informing him that the Key Man Policy lapsed on May 21, 2006, and "does not have any value or coverage at this time."[20] A week later, Colleen Handy of Johnson Lambert emailed Jackson to ask if there was "any resolution" on the Key Man Policy confirmation and request that "someone from your office forward it on to us," because Hartford Life told Johnson Lambert that they sent it to Jackson.[21]

---

[17]     *Id.* ¶¶ 106-108.

[18]     *Id.* ¶¶ 110-114.

[19]     *Id.* ¶¶ 127-128.

[20]     *Id.* ¶ 130.

[21]     *Id.* ¶ 132.

10

The Receiver alleges that Johnson Lambert knew, or should have known, that it was a breach of its internal policies and generally accepted auditing standards for it to seek the requested confirmation from Jackson, instead of directly from Hartford Life.[22] In any event, ten weeks went by without Jackson providing Johnson Lambert any confirmation regarding the Key Man Policy. Handy again emailed Jackson on September 29, 2008. He still did not respond.[23]

Unbeknownst to Handy, that same day Jackson faxed another confirmation request to Hartford Life. By letter dated October 10, 2008, Hartford Life responded, again informing Jackson that the Key Man Policy was no longer active. The Receiver alleges that this second request from Jackson was a ruse, and that he sent it simply to obtain the name and title of a different Hartford Life employee, which he got in the October 10 letter.[24] According to the Complaint, Jackson used this information to alter the original confirmation inquiry form Johnson Lambert had sent to Hartford Life in July 2008.

On October 24, 2008, nearly eight months after her initial request, Handy of Johnson Lambert reported to Drost of Wilmington Trust that she had received confirmation that the Key Man Policy was current and held a cash value of $716,000 as of December 31, 2007.[25] This confirmation was a forgery, allegedly sent via facsimile to

---

[22]     *Id.* ¶¶ 129, 133.

[23]     *Id.* ¶¶ 167-168.

[24]     *Id.* ¶¶ 184-185.

[25]     *Id.* ¶ 187.

Handy from Jackson, who had disguised the transmission as having come from Hartford Life. The faxed confirmation form stated that the original would be mailed, but no original ever arrived. Yet, Johnson Lambert never inquired further.[26]

### b.     The bank account confirmations

The alleged irregularities surrounding the SPI Entities' bank account confirmations are even more suspicious than the long-delayed and apparently forged Key Man Policy confirmation. The bank confirmation process unfolded during the same time period as that regarding the Key Man Policy, starting in June 2008. As with the Key Man Policy, Jackson delayed or failed to respond to the initial requests from Wilmington Trust. In mid-July, Jackson signed request forms that Handy sent to the banks, with the instruction that the banks should confirm the relevant account balances and return the original confirmation requests, or "confirms" as they were called, by mail directly to Johnson Lambert.[27]

Six bank account confirms evidently were needed to prepare the 2007 Audited Financial Statements. In late July and August 2008, as Handy at Johnson Lambert was receiving the account confirms from the banks, she was having difficulty matching them up with the account statements that Jackson had given to Wilmington Trust.[28] In addition, one of the larger accounts, a Wachovia Securities money market account, could

---

[26]     *Id*. ¶¶ 189-191.

[27]     *Id*. ¶¶ 121-123.

[28]     *Id*. ¶¶ 135-137.

12

not be confirmed because, according to Wachovia, Jackson had not paid the nominal confirmation processing fee.[29]  As August drew to a close, Drost emailed Jackson a list of issues that were preventing Johnson Lambert from completing its audit.  The issues included that: (1) Johnson Lambert needed to contact Jackson's person at Wachovia to expedite the confirms on several of the banking accounts; (2) a Wachovia Securities account confirm showed a balance that was $300,000 less than the corresponding bank statement Jackson provided; (3) the confirm for a Wells Fargo money market account owned by SPI-203 reflected a balance of only $104, while the corresponding statement submitted by Jackson showed a balance of $2,361,706; (4) another Wells Fargo account was apparently closed, while Jackson's statement showed it open and holding a $10,000 balance; and (5) there were discrepancies with three Bank of America confirms, but the bank would not discuss them with Johnson Lambert.[30]  One would think that item (3), at least, screamed for attention.

Patrick Theriault of Wilmington Trust emailed Jackson, saying that these issues were "puzzling to say the least," and that the "significant variances . . . do not appear to make sense."[31]  On September 4, Handy emailed Drost of Wilmington Trust to say that she still had not received a signed request form from Jackson.  Although Jackson told her that he tried to send it, but it "got bounced back to him," Handy considered that odd

---

[29]    *Id.* ¶¶ 138-141.

[30]    *Id.* ¶ 147.

[31]    *Id.* ¶ 145.

13

because Jackson had emailed her that day, and he "does have the right email address."[32] Around the same time period, Drost and Theriault told Jackson that these "logistical difficulties" could be avoided if Wilmington Trust had direct access to the bank accounts. Jackson allegedly ignored the request, and never took steps to give Wilmington Trust such access.[33]

As the process dragged on, the Wells Fargo, Wachovia Bank, and Wachovia Securities accounts proved the most difficult for Johnson Lambert to confirm and reconcile. In September 2008, Jackson instructed Wilmington Trust and Johnson Lambert that, instead of going through the audit departments at the banks, they should speak directly with Jackson's contacts—Joe Lobe or his assistant Pamela Goyette at Wells Fargo, and "Alpesh" or his assistant "Rachel" at Wachovia.[34] The Receiver avers that an Alpesh Patel was employed during this time by Wachovia Securities, but that the "Alpesh" and "Rachel" to whom Jackson referred were in fact "accomplices of [Jackson], if they existed at all."[35] Jackson apparently never provided the last name of "Alpesh." Moreover, the Complaint alleges that "a simple internet search" at that time would have revealed that the phone number Jackson provided for "Alpesh" was not a Wachovia

---

[32] *Id.* ¶ 149.

[33] *Id.* ¶¶ 152-153.

[34] *Id.* ¶ 156.

[35] *Id.* ¶ 157.

number.[36] Instead, it appears that Jackson's own J. Mading used that phone number. Indeed, J. Mading had included it on its website and in other publications.[37]

On September 29, 2008, Handy notified Drost that the Wells Fargo and Wachovia account confirms were "rec'd and tied," without any further explanation. The Wachovia confirms allegedly were provided by "Rachel," the purported assistant of "Alpesh."[38] A day later, Handy told Drost and Theriault that she had attempted unsuccessfully to call "Alpesh" and Lobe multiple times. In response, Drost asked whether "the Wachovia contact [was] a different person for the Wachovia Securities confirm, or is this a contact for the regular retail banking accounts?" He also indicated that they should be "curious" about the Wells Fargo and Wachovia Securities confirmations, because of their "sudden resolution."[39] When Handy confirmed that "Alpesh" was the contact Jackson had given for both Wachovia Bank and Wachovia Securities, Drost observed that, "This is a little odd as Wachovia Securities is on the Trust side of the Wachovia structure," and that in his experience, "Most banks . . . have definitive separation . . . between their retail banking side of the business and the trust (investment) side."[40] Drost concluded that it "maybe, and hopefully is, OK," but that he would "try to contact both of them as well, to

---

[36]     *Id.* ¶¶ 160, 162.

[37]     *Id.* ¶ 162.

[38]     *Id.* ¶¶ 165-166.

[39]     *Id.* ¶¶ 171-172.

[40]     *Id.* ¶ 174.

confirm if there was any specific reasons why suddenly now they are able to satisfy all the confirmations."[41]

Nearly a month later, as of late October, Handy still had not heard from either "Alpesh" or Lobe despite having left messages and asked Jackson several times to instruct them to call her, or to set up a conference call for all of them. The discrepancies between the statements provided by Jackson and the confirms received from Wachovia— which allegedly had exceeded $2,000,000—were the only things preventing the 2007 Audited Financial Statements from being completed. Through an email to Jackson, Drost joined in Handy's pleas. Their efforts persisted through November and most of December.

It was not until December 29, 2008, however, that Bolton of Johnson Lambert received a call from a person identifying himself as "Alpesh." The caller explained that the bank confirmation discrepancies purportedly appeared because "they sold ars [sic] securities before year end that took a while to clear."[42] Bolton attempted to verify this information with Drost, but Drost could not find any trades that might fit Alpesh's description. In a communication to Drost, Bolton stated that he thought "maybe they were sold from another account [and] then deposited into this one? At any rate does this

---

41      *Id.* ¶ 175.

42      *Id.* ¶ 204.

16

make sense to you?  He caught me at a bad time and the reception was not good, so it was hard to hear him."[43]

Drost, admitting that he was "being optimistic," thought that the explanation given by "Alpesh" potentially could be chalked up to internal errors at the bank, and the lengthy delays and inconsistencies to the bank wanting to "save face."  In any event, based on the new documents provided by "Rachel" and "Alpesh," Drost considered the bank confirmation to have been completed satisfactorily.  According to the Receiver, in preparing the final 2007 Audited Financial Statement, Johnson Lambert used the fraudulent bank account balances from the documents that Jackson provided and "Alpesh" confirmed, rather than the different and significantly lesser amounts reflected in the written confirmations that it obtained directly from the banks.[44]  As a result, the 2007 Audited Financial Statement, which was completed at the end of December 2008, reported that SPIC-DC held about $7.1 million in assets as of December 31, 2007.

c.      **The SPI Entities' Boards approve the 2007 Audited Financial Statements**

Special meetings of the boards of directors of Security Pacific, SPI-202, SPI-203, and SPI-204 were held at the Delaware offices of Wilmington Trust on February 3, 2009 (the "February 2009 Meetings").  The boards of the SPI Entities were identical; they consisted of Jackson, James L. Jackson, King, Davis, and Kantner.  Drost and Theriault

---

[43]      *Id*. ¶ 206.

[44]      *Id*. ¶ 209.

17

allegedly attended the February 2009 Meetings in person or by teleconference, and one of them served as secretary and recorded the meeting minutes.

Notably, the audited financials were accompanied by a letter addressed to the SPI Entities' boards from Johnson Lambert (the "Significant Matters Letter").[45] The Letter discussed the significant delay in completing the audit, and noted that six of the seven bank account confirmations diverged from the relevant account statements by "significant amounts ($2,361,602 in one case)" and that several follow-up inquiries were needed to resolve the discrepancies.[46] Johnson Lambert also addressed a letter to Jackson, as President and Chairman of Security Pacific, outlining several recommendations for improving operations (the "Jackson Letter"). The Jackson Letter, which was provided to the entire Board, indicated that the identified issues were "not considered to be material weaknesses."[47] The minutes allegedly indicate that the directors reviewed the 2007 Audited Financial Statements and approved them with "no substantive discussions or debate."[48]

### 3. The 2008 Audited Financial Statements are prepared and approved

Wilmington Trust's MSA automatically renewed at the end of 2008, and it therefore remained the captive manager for the SPI Entities. Johnson Lambert again was

---

[45]  *Id*. Ex. F [hereinafter "Significant Matters Letter"].

[46]  *Id*. ¶ 217.

[47]  *Id*. ¶ 218; *id*. Ex. G [hereinafter "Jackson Letter"].

[48]  *Id*. ¶ 216.

retained to serve as the SPI Entities' certified public accountant and independent auditor for the preparation of the audited financial statements for the calendar year ending December 31, 2008 (the "2008 Audited Financial Statement").[49] Wilmington Trust and Johnson Lambert began the process of preparing that statement early in 2009.

The Receiver's allegations with respect to the 2008 Audited Financial Statement are substantially similar to those relating to the 2007 Audited Financial Statement. In particular, the Complaint alleges that Jackson engaged in delay tactics and obfuscation in his dealings with Wilmington Trust and Johnson Lambert.[50] On June 23, 2009, Jackson allegedly delivered to Johnson Lambert another fraudulent confirmation for the Key Man Policy, after he had corresponded again with Hartford Life and received a second indication that the Key Man Policy lapsed in October 2006 and was worthless.[51] After receiving the fraudulent facsimile confirmation of the Key Man Policy from Jackson, Johnson Lambert never obtained the original or otherwise followed up with Hartford Life.

---

[49] *Id*. ¶¶ 223-224.

[50] *Id*. ¶¶ 227-238.

[51] *Id*. ¶¶ 239-253. In this regard, I also note that Johnson Lambert received a letter from Hartford Life in June 2009, indicating that Johnson Lambert's confirmation form could not be processed because it was not signed by the policy owner. According to the Receiver, this was another red flag because Johnson Lambert had not sent a confirmation form to Hartford Life; rather, it is alleged that Jackson had emailed Hartford Life a form that was intended for Handy of Johnson Lambert to submit to Hartford Life. *Id*. ¶¶ 243-244.

19

Also in June of 2009, Wilmington Trust and Johnson Lambert received allegedly fraudulent bank account confirmations from Jackson or his accomplice "Alpesh." Using that information, Johnson Lambert completed the 2008 Audited Financial Statement. As of September 2009, however, Johnson Lambert allegedly still was waiting for bank statements and other items from Jackson so that it could perform the confirmations needed for the "subsequent events" aspect of the audit.[52]

The boards of the SPI Entities held their annual meetings on October 8, 2009, at Wilmington Trust's Delaware office (the "October 2009 Meetings"). As of that date, the composition of the boards had changed. The directors for each of the SPI Entities in October 2009 consisted of Jackson, Muñoz, King, Davis, and Kantner. Drost and Theriault also attended the October 2009 Meetings.[53] At those meetings, the boards approved the 2008 Audited Financial Statement, again with little or no discussion.

Notably, there is no indication that Johnson Lambert ever followed up on the Significant Matters Letter or the Jackson Letter. As discussed above, those letters were provided to the Board in connection with the previous audit. They recommended that the SPI Entities change their procedures to conduct bank reconciliations on a monthly basis, and confirm accounts with the banks on a quarterly basis, in light of the "numerous differences" experienced in the 2007 Audited Financial Statements.[54] In a similar vein,

---

[52]     *Id*. ¶ 269.

[53]     *Id*. ¶¶ 270-272.

[54]     Jackson Letter 2.

Wilmington Trust had requested during the preparation of the 2007 Audited Financial Statements to have direct access to the bank accounts. The Complaint suggests that none of those recommended changes were made in the months between the February 2009 Meetings and the October 2009 Meetings. Indeed, it appears that neither Johnson Lambert, nor Wilmington Trust, nor any of the SPI Entities' directors inquired at the October 2009 Meetings as to the status of either of those previously reported deficiencies or suggested procedural improvements.[55] In any event, the recommended changes were never made.

### 4. The 2009 Audited Financial Statements are prepared and approved

At the October 2009 Meetings, Jackson notified the SPI Entities' boards that he did not intend to re-engage Johnson Lambert for the companies' next audit. Wilmington Trust's contract automatically renewed and in its continuing role as the captive manager, it assisted in seeking a new accounting and audit firm. Pursuant to an agreement dated April 23, 2010, McSoley McCoy was engaged to perform the SPI Entities' audit for the year ending December 31, 2009 (the "2009 Audited Financial Statement").[56]

In May 2010, Drost forwarded to Nicholae Lungu of McSoley McCoy the bank and Key Man Policy confirmations used in connection with the prior year's audit. In his email to Lungu, Drost explained that, "In previous years, all of the Wachovia and Wachovia Securities confirmations were additionally faxed to a representative there

---

[55]     Compl. ¶¶ 274-279.

[56]     *Id*. ¶ 282; *id*. Ex. I.

21

named Alpesh, since he was able to make sure these were responded to right away, and avoided the new $25 audit confirmation response fee that they were initiating."[57] Drost copied Jackson on the email and asked him to "please confirm this person's full name, and his contact information," saying that he only had a phone number for Alpesh's assistant, and was not having "any success getting through, or even getting an opportunity to leave a message."[58]

About two months later, either Jackson or "Alpesh" complied with Drost's request for bank confirmations. The documents provided, however, were fraudulent confirmations as to the bank accounts, and yet another forged Key Man Policy confirmation, which showed the Policy as still effective and having a $700,000 cash value.[59] Like Johnson Lambert, McSoley McCoy never obtained the original policy from Hartford Life or otherwise communicated directly with them regarding the Key Man Policy.

McSoley McCoy completed the 2009 Audited Financial Statements at the end of July 2010. As with the 2007 and 2008 Audited Financial Statements, this one "confirmed" that the SPI Entities' total capitalization was around $7 million. The SPI Entities' boards again met at Wilmington Trust on December 15, 2010 (the "2010 Meetings"). By the time of that meeting, only Jackson, Davis, and Kantner remained as

---

[57]     *Id.* ¶ 287.

[58]     *Id.*

[59]     *Id.* ¶ 291.

directors of the boards of Security Pacific, SPI-202, SPI-203, and SPI-204.[60] The Complaint does not address when, how, or why Muñoz and King left the boards or the reasons for the director turnover between the February 2009 and October 2009 Meetings. As with the previous two meetings, Drost and Theriault attended the 2010 Meetings on behalf of Wilmington Trust. At those Meetings, the boards approved the 2009 Audited Financial Statement with "no substantive discussions or debates."[61]

### 5. Wilmington Trust finally blows the whistle

In March 2011, for reasons not alleged in the Complaint, Wilmington Trust decided to inform the DDOI that it had noted certain irregularities or discrepancies involving Wachovia bank statements provided by Jackson on behalf of the SPI Entities. On March 15, 2011, Richard Klumpp, President and CEO of Wilmington Trust, sent an email to the DDOI in which he listed several of the SPI Entities' Wachovia accounts and compared the balances as reported in their recent statement to the Department (based on figures they had received from Jackson) to those reflected in confirmations they had received directly from Wachovia.[62] Jackson's figures portrayed the six accounts as holding values ranging from $25,000 to $1.7 million, and totaling $4.6 million in the

---

[60]     *Id.* ¶ 299.

[61]     *Id.* ¶ 302.

[62]     *Id.* Ex. K.

23

aggregate.  In reality, those accounts held a few hundred dollars each, except for one account, which seemed to be closed.[63]

On March 25, 2011, the DDOI sought and obtained from this Court a "Confidential Seizure and Injunction Order" pursuant to 18 *Del. C.* § 5943.  The Department undertook further investigation, and ultimately obtained the Liquidation Order on June 15, 2011.  In her capacity as Receiver of the SPI Entities in liquidation, the Commissioner investigated their financial condition.  She concluded that "the assets of each of these entities is minimal when compared to the assets that were reflected in the entities' audited financial statements and fraudulent bank statements" that were provided by Jackson.[64]  The Receiver's Complaint focuses on certain fraudulent bank statements Jackson gave to Wilmington Trust around July 2009, but also specifically alleges that Jackson's deception "both pre-existed and post-dated July of 2009."[65]

## C.    Procedural History

As noted above, the Liquidation Action commenced on March 25, 2011.  The Receiver filed this action on January 31, 2014, on behalf of the SPI Entities in liquidation.  Counts 1 through 3 of the Complaint, respectively, accuse Wilmington Trust of breach of fiduciary duties, breach of contract, and negligence.  The same basic charges are leveled against Johnson Lambert (Counts 4–7) and McSoley McCoy (Counts 8–10).[66]

---

[63]    *Id.*

[64]    *Id.* ¶ 311.

[65]    *Id.* ¶¶ 312-316.

Count 11 includes a claim for breach of fiduciary duties against directors Jackson, Davis, King, and Kantner, and against Wilmington Trust. Finally, Count 12 charges Wilmington Trust, Johnson Lambert, McSoley McCoy, and Kantner with aiding and abetting the directors' alleged breaches of fiduciary duty.

James L. Jackson, Muñoz, and Ryan Building Group also were named as defendants in relation to the claim in Count 11 for breach of fiduciary duties against the SPI Entities' directors. As noted above, Ryan Building Group was dismissed voluntarily. James L. Jackson and Muñoz sought dismissal of the Complaint as it related to them under Court of Chancery Rule 12(b)(6). On August 12, 2014, I granted that motion.[67]

Currently before me are motions to dismiss filed by Wilmington Trust and Kantner, Johnson Lambert, and McSoley McCoy. Wilmington Trust and Kantner's motion was fully briefed and argued September 9, 2014. Because those two Defendants joined in several of the arguments raised by Johnson Lambert and McSoley McCoy in support of their motions, I reserved judgment and determined to decide all three motions

---

[66]   As to Johnson Lambert, two separate counts for breach of contract are pled, one each for the 2007 and 2008 engagement agreements.

[67]   *Stewart v. Wilm. Trust SP Servs., Inc.*, C.A. No. 9306-VCP, at 25-26 (Del. Ch. Aug. 12, 2014) (TRANSCRIPT). In that ruling, I concluded based on the factual allegations in the Complaint that it was not reasonably conceivable that Muñoz or James L. Jackson could be found liable on a *Caremark* theory of director oversight liability. In part, I based that conclusion on the fact that the boards had retained and received reports from independent auditors, Johnson Lambert and McSoley McCoy. *Id.* at 16-17, 25.

together. The separate motions filed by Johnson Lambert and McSoley McCoy were argued November 20, 2014.[68] This Opinion resolves all three of these motions.

### D. Parties' Contentions

In seeking dismissal, Wilmington Trust, Kantner, Johnson Lambert, and McSoley McCoy raise a slew of arguments that overlap to a significant degree. All of the Moving Defendants assert that the Complaint should be dismissed on grounds of *in pari delicto*. They also join in arguing that the claims at issue are time-barred.

Putting aside those common arguments, each Moving Defendant also seeks dismissal of the various counts in the Complaint against them for failure to state claims upon which relief could be granted. Johnson Lambert asserts that the breach of fiduciary duty, negligence, and aiding and abetting claims against it are barred because, among other reasons, they are precluded by the contractual relationship it has with the SPI Entities. Johnson Lambert challenges the claim for breach of contract for failure to allege causation. McSoley McCoy makes similar arguments.

Wilmington Trust similarly contends that the Receiver cannot recover on her fiduciary duty and negligence theories because those allegations sound in breach of contract. It also asserts that the contract claim is defective, because it seeks to impose

---

[68] The briefing on these motions is voluminous, consisting of three separate briefs in both the opening and reply rounds—one each for Wilmington Trust and Kantner, Johnson Lambert, and McSoley McCoy. The Receiver filed two answering briefs, one in response to Wilmington Trust and Kantner, and one combined response to the Auditor Defendants' motions. I cite the briefs as, for example, "Wilm. Trust Opening Br.," "Receiver's Answering Br. to Auditor Defs.," and so on.

duties that go beyond the terms of the MSA. Wilmington Trust further argues that the aiding and abetting claim must be dismissed for lack of requisite "knowing participation." Kantner seeks dismissal of the indirect aiding and abetting claim against him on grounds that any conduct of his as a director of an SPI Entity that would rise to the level of aiding and abetting would, in itself, be a direct breach of fiduciary duty. Kantner also contends that the claim for breach of fiduciary duty against him should be dismissed for failure to state a claim.

## II.     ANALYSIS

### A.     Choice of Law

As a threshold matter, I conclude that Delaware law governs my analysis of the pending motions to dismiss. None of the parties strongly contends otherwise,[69] but Johnson Lambert suggests that the applicable law arguably could be that of Delaware, South Carolina (the location of Johnson Lambert's audit team), California (Jackson's principal place of business), or the District of Columbia (the place of incorporation of the SPI Entities' predecessors).[70] The Receiver seems to argue that Delaware law should apply in this situation, but she hedges by suggesting that material issues of fact may exist as to the correct choice of law.[71]

---

[69]     Wilm. Trust Opening Br. 31; McSoley McCoy Opening Br. 15 n.1.

[70]     Johnson Lambert Opening Br. 30, 33-37.

[71]     Receiver's Answering Br. to Auditor Defs. 46-47.

The causes of action here include claims sounding in breach of fiduciary duty, breach of contract, and tort, which are subject to different considerations for purposes of determining what law applies. Although the parties did not squarely address the question of choice of law, I consider it necessary to decide that issue, because whether and how I apply the doctrines of *in pari delicto* and laches might differ depending on which state's law governs.[72] Delaware law applies, however, at a minimum, to the claims for breach of fiduciary duties, because the SPI Entities are Delaware corporations.[73] Thus, each of the Moving Defendants is defending against at least one claim that will be governed by Delaware law.[74]

---

[72] I am mindful that, depending on the law of the states whose law arguably might apply, there may not be a conflict and the choice of law issue would be moot. *See Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010) ("As we explain below, the result would be the same under both Delaware and Dubai law. Therefore '[a]ccording to conflicts of law principles . . . there is a 'false conflict,' and the Court should avoid the choice-of-law analysis altogether.'"). But it is difficult to assess that question on the incomplete briefing record before me. I therefore provide the analysis that follows in the interest of completeness and to facilitate appellate review.

[73] *See VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005) ("It is now well established that only the law of the state of incorporation governs and determines issues relating to a corporation's internal affairs.") (citing *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89-93 (1987)).

[74] Counts 1, 4, 8, and 11 plead claims for breaches of fiduciary duty against Wilmington Trust, Johnson Lambert, McSoley McCoy, and the SPI Entities' directors (including Kantner).

The internal affairs doctrine, however, does not extend to claims "where the rights of third parties external to the corporation are at issue."[75] Hence, the claims for breach of contract and negligence against Wilmington Trust and the Auditor Defendants are subject to the "most significant relationship test" of the Restatement (Second) of Conflicts of Laws.[76] For torts, the relevant factors of that test are: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."[77] For breach of contract claims, the factors differ slightly. They are: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of

---

[75]     *VantagePoint Venture P'rs 1996*, 871 A.2d at 1113 n.14.

[76]     *See Travelers Indem. Co. v. Lake*, 594 A.2d 38, 41, 47 (Del. 1991). Although I need not reach the issue, I would expect to apply Delaware law to the aiding and abetting causes of action here. Wilmington Trust and Kantner assert that aiding and abetting liability sounds in tort, and there is support for that proposition. *See, e.g.*, *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 220 n.1 (Del. Ch. 2014). Because liability for aiding and abetting a breach of fiduciary duty depends in part on the finding of an underlying fiduciary duty and a breach of that duty— issues that in this case, under the internal affairs doctrine, would turn on Delaware law—it would seem illogical to apply another state's law to the "tort" of aiding and abetting such a breach, even if the most significant relationship test pointed to that result. *Cf. In re Am. Int'l Gp., Inc. Consol. Deriv. Litig.*, 965 A.2d 763, 822 (Del. Ch. 2009) [hereinafter "*AIG I*"], *aff'd sub nom. Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).

[77]     RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971).

incorporation and place of business of the parties."[78]  Under both the tort and contract

analyses, the relevant factors are to be evaluated according to their relative importance

with respect to the particular issue involved.[79]

Having considered the relevant factors of the test applicable in both the contract

and tort contexts, I conclude that Delaware law should apply to all of the claims in this

action.  Admittedly, several alleged facts slightly favor other states.  Those facts include

that: Jackson allegedly lived and operated his business in California during the relevant

time period;[80] the SPI Entities' predecessors were incorporated in the District of

Columbia;[81] Theriault and Drost worked out of Wilmington Trust's office in Burlington,

Vermont;[82] several of the relevant Johnson Lambert actors, including Bolton and Handy,

worked in the firm's South Carolina offices;[83] and McSoley McCoy evidently also is

based in Vermont.[84]  It is not clear from the Complaint precisely where the accounting

and auditing services actually were performed by Johnson Lambert and McSoley McCoy.

At this relatively early stage, I consider it reasonable to infer, however, that it occurred in

---

[78]     *Id*. § 188.

[79]     *TrustCo Bank v. Mathews*, 2015 WL 295373, at *9 (Del. Ch. Jan. 22, 2015).

[80]     Compl. ¶¶ 29, 43-46.

[81]     *Id*. ¶ 42.

[82]     *Id*. ¶ 87.

[83]     *Id*. ¶ 97.

[84]     *Id*. Ex. I.

other states.  Likewise, it fairly may be inferred that Theriault and Drost performed much of their captive services management work for Wilmington Trust in Vermont.

In contrast, many of the pertinent factors identified in the Restatement weigh in favor of Delaware, and I find that their cumulative effect eclipses that of factors that weigh in favor of applying California, D.C., South Carolina, or Vermont law.  Regarding the negligence claims, I consider the alleged injury to have occurred in Delaware, where certain Defendants are alleged to have fraudulently inflated the SPI Entities' financial situation in order to deceive, primarily, the DDOI.  As relevant to both the tort and contract analyses, while some of the Defendants may be incorporated in or reside elsewhere, all of the SPI Entities, whose legal and equitable claims the Receiver asserts in liquidation here, are Delaware corporations.  Perhaps most persuasively, each of the three meetings of the SPI Entities' boards, upon which the Complaint's narrative of Defendants' alleged wrongdoing focuses, took place at Wilmington Trust's office in Delaware.  Thus, of the states discussed by the parties, Delaware has the strongest claim to being "the place where the relationship, if any, between the parties is centered."

The subject matter of the relevant contracts, *i.e.*, the provision of audit or management services to Delaware-domiciled captive insurance companies, supports the same conclusion.  Consequently, without even delving into the myriad issues related to the nature of captive insurance as a highly regulated industry under Delaware law, or the fact that the Insurance Commissioner has brought this action pursuant to her statutory authority as the receiver of these companies in liquidation, I conclude that Delaware law should govern not only the claims that implicate the internal affairs doctrine, but also the

31

breach of contract and negligence claims as well. It is also true, however, that, "[i]n applying Delaware law, [this Court may] look, as courts often do, to well-reasoned precedent from federal courts, courts of our sister states, and our Anglo–American jurisprudential tradition."[85] Accordingly, I will not hesitate to do so.

## B.     Standard of Review

A motion to dismiss under Rule 12(b)(6) must be denied "unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible to proof."[86] In determining whether the Complaint meets this pleading standard, this Court will draw all reasonable inferences in favor of Plaintiffs and "accept all well-pleaded factual allegations in the Complaint as true."[87] The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[88]

## C.     Laches Does Not Bar These Claims

All of the Moving Defendants contend that the Complaint is untimely.[89] They focus on the three-year statute of limitations applicable to the claims for breach of contract, negligence, and breach of fiduciary duty, and argue that each of the causes of

---

[85]   *In re Am. Int'l Gp., Inc., Consol. Deriv. Litig.*, 976 A.2d 872, 882 (Del. Ch. 2009) [hereinafter "*AIG II*"].

[86]   *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[87]   *Id.*

[88]   *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011).

action accrued more than three years before the Receiver filed her Complaint on January 31, 2014.[90] The Receiver does not contest that proposition, but contends that the statute of limitations either should not apply because it would lead to an inequitable result, or did not begin to run until March 25, 2011, when she was appointed as Receiver.[91] Because I agree with the first of those arguments, I do not address the second.

To determine whether an action was timely filed, this Court adheres to the doctrine of laches, the "equitable analog of the statute of limitations defense."[92] While the statute of limitations is not controlling in this Court, a suit in equity generally "will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law."[93] Nevertheless, in cases where "unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer period than that fixed by the statute," this Court has the power to set aside the statutory limitation period and analyze whether the claim was untimely based on laches principles.[94] The Court must consider all the relevant facts in

---

[89] Wilm. Trust Opening Br. 28-30; Johnson Lambert Opening Br. 24-28; McSoley McCoy Opening Br. 21-23.

[90] *See* 10 *Del. C.* § 8106; *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *6 (Del. Ch. Jan. 27, 2010), *aff'd*, 7 A.3d 485 (Del. 2010).

[91] Receiver's Answering Br. to Wilm. Trust 19-26; Receiver's Answering Br. to Auditor Defs. 48-56.

[92] *TrustCo Bank*, 2015 WL 295373, at *5.

[93] *IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177 (Del. 2011).

[94] *Id*. at 177-78.

this regard, as there is no specific definition of "unusual or extraordinary circumstances."[95]

Based on the circumstances of this case, I am not inclined to mechanically apply the three-year statute of limitations under the laches rubric. Rather, I must analyze the timeliness of the Complaint based on the principles of laches more generally. To begin with, while this action was not filed until January 2014, the Receiver has been "pursuing" these claims at least since March 2011, when the Liquidation Action was commenced and the SPI Entities were placed into receivership. Notably, in effectuating service of process of the papers in the Liquidation Action on the SPI Entities, the Commissioner served Wilmington Trust as their registered agent.[96]

Further, from its inception until early 2014, the Liquidation Action involved fairly extensive litigation activity, including, for example: (1) contested motions concerning whether and how the Receiver could pay the ongoing administrative and legal expenses

---

[95] *Id*. at 178. Factors that guide this analysis include: "1) whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired; 2) whether the delay in filing suit was attributable to a material and unforeseeable change in the parties' personal or financial circumstances; 3) whether the delay in filing suit was attributable to a legal determination in another jurisdiction; 4) the extent to which the defendant was aware of, or participated in, any prior proceedings; and 5) whether, at the time this litigation was filed, there was a bona fide dispute as to the validity of the claim." *Id*.

[96] *See In re Liquid. of Sec. Pac. Ins. Co.*, C.A. No. 6317-VCP, Docket Item ("D.I.") Nos. 5-8.

of the SPI Entities;[97] (2) periodic reports as to the financial status of the SPI Entities, some of which were objected to;[98] (3) a petition for the Court to set a bar date for claims against the SPI Entities;[99] and (4) numerous motions and hearings relating to former Defendant Ryan Building Group's claim regarding SPI-202, which ultimately resulted in a settlement shortly before the trial of that claim.[100] Unlike a situation in which a plaintiff is injured and then merely waits for years to file her action, the circumstances of this case arguably required the Receiver first to achieve certain successes in the Liquidation Action before completing her efforts to gather and marshal the facts necessary to plead non-conclusory allegations on behalf of the SPI Entities. Much of the Receiver's activity in that regard was occasioned by the positions taken by certain parties to this action, most notably Ryan Building Group.

Meanwhile, the Receiver engaged in an extensive investigation to uncover the facts relating to the allegedly fraudulent conduct and related breaches of the Moving Defendants. As is evident from the face of the Complaint, the Receiver obtained and reviewed documents from at least some of the Moving Defendants, because the Complaint quotes extensively from emails and other communications that could not

---

[97] *Id.*, D.I. Nos. 44, 70; *see also In re Liquid. of Sec. Pac. Ins. Co.*, C.A. No. 6317-VCP, at 1 (Del. Ch. May 10, 2012). One of the original Defendants in this action, Ryan Building Group, disputed the authority of the Receiver in that regard in the Liquidation Action.

[98] *E.g.*, *In re Liquid. of Sec. Pac. Ins. Co.*, C.A. No. 6317-VCP, D.I. Nos. 48-51, 54.

[99] *Id.*, D.I. No. 52.

[100] *Id.*, D.I. Nos. 107, 114, 144, 145, 158.

35

otherwise have been known.[101] This circumstance undermines any element of unfair surprise the Moving Defendants might claim with respect to the timeliness of this action. Indeed, taking into account all of the facts, I conclude that this case exhibits sufficiently "unusual or extraordinary" circumstances, based on the factors the Delaware Supreme Court has considered material in determining whether grounds exist for declining to apply the statutory limitation period.[102]

Instead, I find it more appropriate to consider whether laches would apply to bar these claims. A laches analysis calls for a context-specific application of the maxim that "equity aids the vigilant, not those who slumber on their rights."[103] While there is "no hard and fast rule as to what constitutes laches," establishing the elements of the defense generally requires: (1) knowledge by the claimant; (2) unreasonable delay in bringing the claim; and (3) resulting prejudice to the defendant.[104] The defense of laches is "not ordinarily well-suited" for treatment on a Rule 12(b)(6) motion."[105] Because there is neither unreasonable delay on the Receiver's part, nor prejudice to the Moving Defendants, I conclude that laches does not support dismissal of these claims.

---

[101] *E.g.*, Compl. ¶¶ 171-175, 205-209.

[102] *See IAC/InterActiveCorp*, 26 A.3d at 178.

[103] *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009) (quoting 2 JOHN NORTON POMEROY, EQUITY JURISPRUDENCE §§ 418, 419 (5th ed. 1941)).

[104] *Reid*, 970 A.2d at 183.

[105] *Id*.

An "unreasonable delay" for purposes of laches can range from one month to many years.[106] "The length of the delay is less important than the reasons for it."[107] In this case, there are two components of alleged delay. The first is from the time that the DDOI knew or was on inquiry notice that there might be a problem with the SPI Entities until the time the Receiver took action to prosecute these claims. The Moving Defendants contend that no later than the February 2009 Meetings,[108] the SPI Entities' directors—and, by extension, the Commissioner—were on notice as to the possibility of accounting irregularities based on the Significant Matters Letter. They conclude that because the DDOI was on inquiry notice as of early 2009 at the latest, the filing of the Complaint in January 2014 was unreasonably delayed.

I do not consider it appropriate or helpful, however, to look at the period from early 2009 to early 2014, as one undifferentiated time period. In reality, there are two distinct periods: (1) from the time the claims accrued in or around 2009 until the Commissioner placed the SPI Entities into receivership and began the process of stating claims on their behalf; and (2) from the establishment of the receivership until the filing

---

[106]    *IAC/InterActiveCorp*, 26 A.3d at 177.

[107]    *Id*.

[108]    Defendant McSoley McCoy did not provide audit services until 2010 in connection with the 2009 Audited Financial Statements. Because the claims against McSoley McCoy arose significantly later than the claims against Wilmington Trust and Johnson Lambert, but otherwise also are affected by the alleged fraud by Defendant Jackson and wrongdoing by the Moving Defendants, referenced *infra*, I consider it unnecessary to discuss separately McSoley McCoy's laches defense in this regard.

of this action. The Moving Defendants' argument regarding inquiry notice relates to the former period, beginning in early 2009, and not the latter. In view of the allegations in the Complaint regarding fraud by Defendant Jackson and wrongdoing by the Moving Defendants in connection with the 2007, 2008, and 2009 Audited Financial Statements, I find that it is at least reasonably conceivable the Receiver will be able to show that neither she, as Insurance Commissioner, nor the DDOI engaged in any unreasonable delay before she was appointed Receiver in March 2011.[109]

The second alleged period of delay is from the appointment of the Receiver in March 2011 until the filing of this action in January 2014. As just discussed, there was a substantial amount of litigation activity in the related Liquidation Action, and it is reasonable to infer at this preliminary stage that the Receiver's tardiness in filing this action was caused in large part by that activity. Moreover, as noted, when the Receiver took control of the SPI Entities in March of 2011, she had to begin unraveling a complicated web of facts as to how the SPI Entities ended up in the position they were in. It is reasonable to infer that investigation took a considerable amount of time because of its factual complexity rather than delay on the part of the Receiver. Based on these circumstances, the Receiver's good faith prosecution of the related Liquidation Action, the depth and complexity of this factual record, and the specificity and comprehensiveness of the Complaint she ultimately filed, I am not convinced that the Receiver's alleged delay, although significant, was unreasonable.

---

[109]    In that regard, I note that the DDOI sought appointment of the Receiver less than a month after they were advised by Wilmington Trust that there might be a problem.

38

Additionally, the Moving Defendants suffered little or no prejudice due to the fact that the Receiver filed her Complaint in January 2014. As noted above, Wilmington Trust had actual notice from the very outset of the Liquidation Action that the SPI Entities were entering receivership and that any claims of theirs would be prosecuted by the Receiver. Based on the positions they occupied vis-à-vis the SPI Entities and the incomplete information they allegedly had regarding them, I consider it reasonable to infer that in or around March 2011 Wilmington Trust, Johnson Lambert, and McSoley McCoy all recognized the possibility of future claims against them as to those entities. As mentioned above, one or more of those Defendants probably participated in the Receiver's investigation by providing access to documents or other information in their possession, with which the Complaint is replete. I conclude, therefore, that the Moving Defendants could not reasonably have been unaware of the possibility of future claims against them arising out of their dealings with the SPI Entities, and thus were not materially prejudiced when the Receiver waited until January 2014 to file this action. For those reasons, I reject the Moving Defendants' argument that the Complaint should be dismissed as untimely, and proceed to consider other aspects of their motions to dismiss.

### D.     Claims for Breach of Fiduciary Duty[110]

Counts 1, 4, and 8 of the Complaint lodge claims for breach of fiduciary duty against, respectively, Wilmington Trust, Johnson Lambert, and McSoley McCoy. In

---

[110]     As discussed below, the *in pari delicto* defense is not applicable to well-pled claims for breach of fiduciary duty, so I do not address that defense in this section of the Opinion. *See infra* notes 148-53 and related text.

39

Count 11, the Receiver also pleads breach of fiduciary duty as to the SPI Entities' directors, and she includes Kantner and Wilmington Trust in that category.[111] Wilmington Trust and the Auditor Defendants seek dismissal of these Counts, contending that they owed no fiduciary duties to the SPI Entities, and that the factual allegations in this regard are duplicative of the claims for breach of contract. Kantner has moved to dismiss Count 11 as it relates to him on grounds that the Complaint does not allege facts sufficient to give rise to a non-exculpated claim for breach of a fiduciary duty.

## 1. The claims against Wilmington Trust and the Auditor Defendants

As to Wilmington Trust and the Auditor Defendants, I conclude that the claims against them for breach of fiduciary duty must be dismissed. To state a claim for breach of a fiduciary duty, the factual allegations in a complaint must be such that they reasonably could support a finding that a fiduciary duty existed and the defendant breached that duty.[112] Neither Wilmington Trust nor the Auditor Defendants owed a fiduciary duty to the SPI Entities, however.

The Receiver emphasizes that the SPI Entities trusted and relied on the Auditor Defendants' specialized experience in auditing generally and with captive insurance clients specifically. Without those services, the SPI Entities could not have functioned or been licensed in Delaware, and for that reason the Receiver asserts a fiduciary

---

[111] Compl. ¶ 371.

[112] *See In re Mobilactive Media, LLC*, 2013 WL 297950, at *21 (Del. Ch. Jan. 25, 2013).

relationship existed between those entities and the Auditor Defendants.[113] Even accepting those allegations as true and drawing all reasonable inferences in favor of the Receiver, however, the Complaint fails to allege the existence of a fiduciary relationship under Delaware law. The core principle of a fiduciary duty is that "one who controls property of another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner."[114] The duties of care and loyalty flow from that "central aspect" of the fiduciary relationship.[115] Inherent in the fiduciary relationship, "which derives from the law of trusts," is that the fiduciary exercises control over the property of another, and by virtue of that control, is obliged to act with care and loyalty to interests of the beneficial owner.[116] In normal circumstances, an auditor's interests do not align perfectly with those of the client; in order properly to discharge its "watchdog" function, the auditor must "maintain total independence from the client at all times."[117]

---

[113] Receiver's Answering Br. to Auditor Defs. 64-67.

[114] *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991).

[115] *Id.* ("There are, of course, other aspects—a fiduciary may not waste property even if no self interest is involved and must exercise care even when his heart is pure—but the central aspect of the relationship is, undoubtedly, fidelity in the control of property for the benefit of another.").

[116] *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 495 (Del. 2003); *accord USACafes*, 600 A.2d at 48-49.

[117] *United States v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984). Many courts that have addressed the question have declined to find a fiduciary relationship between auditor and client. *See, e.g., Franklin Supply Co. v. Tolman*, 454 F.2d 1059, 1065 (9th Cir. 1971); *Resolution Trust Corp. v. KPMG Peat Marwick*, 844 F. Supp. 431,

Moreover, an auditor normally does not exercise any control over the affairs of the corporation. It is not surprising, therefore, that the Complaint is devoid of factual allegations suggesting that there was some extraordinary circumstance here that would have caused the Auditor Defendants to do so with respect to the SPI Entities. The mere provision of audit services does not of itself convert an auditor into a fiduciary of the corporation. "Our courts have been cautious when evaluating entreaties to expand the number and kinds of relationships that are denominated as 'fiduciary.'"[118] Consistent with that approach, I see no basis for finding that the Auditor Defendants had a fiduciary relationship with the SPI Entities, where the pillars of the fiduciary relationship—control over the property of another and alignment of the controller's interests with those of the beneficial owner—cannot reasonably be inferred from the well-pled allegations of the Complaint.

The situation is no different with Wilmington Trust, despite the Receiver's twofold contention otherwise. First, she argues that, as with the Auditor Defendants, because Wilmington Trust marketed itself to the SPI Entities as having special expertise in captive management, and the SPI Entities relied on the management services provided,

---

436 (N.D. Ill. 1994); *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 552 (S.D.N.Y. 1990). The Receiver has not cited any case that reached the opposite conclusion.

[118] *Bird's Const. v. Milton Equestrian Ctr.*, 2001 WL 1528956, at *4 (Del. Ch. Nov. 16, 2001).

a fiduciary relationship existed that included duties of care and loyalty.[119] The Complaint alleges that Wilmington Trust provided substantial administrative and ministerial assistance relating to the day-to-day operation of the SPI Entities, especially in terms of their compliance and regulatory obligations. Control of the SPI Entities, however, was in the hands of their officers and boards of directors, who were charged, for example, with causing the SPI Entities to contract with Wilmington Trust for the provision of captive management services, and with reviewing and approving the financial statements that were produced with the assistance of Wilmington Trust. Notwithstanding how fraudulently those managers allegedly acted, the SPI Entities were managed by sophisticated business persons. That factual reality negates the kind of control and interest-alignment between Wilmington Trust and the SPI Entities that our case law requires for the existence of a fiduciary relationship. Instead, the SPI Entities and Wilmington Trust had a contractual relationship, defined by the MSA.

The Receiver's second argument as to Wilmington Trust—that it was a "*de facto director*" of the SPI Entities—is similarly unpersuasive.[120] The cases cited by the Receiver in which courts have applied that theory have involved claims under the federal securities and antitrust laws. She offered no support for the proposition that, under Delaware common law, this Court should consider a third-party business entity as a "*de*

---

[119] Receiver's Answering Br. to Wilm. Trust 28-30.

[120] Receiver's Answering Br. to Wilm. Trust 30-32.

43

*facto* director" because its employee sat on the board of the client corporation.[121] The board of directors of a corporation organized under the Delaware General Corporation Law ("DGCL") "shall consist of 1 or more members, each of whom shall be a natural person."[122] In the absence of any case law or persuasive logic supporting the Receiver's position, I reject the notion that a corporate employer of an employee designated to serve as a director of another company could be deemed a *de facto* director of that other company.

## 2. The claims against Kantner

The only remaining Moving Defendant, Kantner, clearly owed fiduciary duties of care and loyalty to the SPI Entities, because he was a director of each of those entities during the relevant time period.[123] Kantner seeks dismissal of the breach of fiduciary duty claim in Count 11 as it relates to him on grounds of exculpation. He argues that each of the SPI Entities' charters contains an exculpation provision consistent with 8 *Del. C.* § 102(b)(7), and the Complaint fails to allege bad faith or any other form of

---

[121] *Id*. (citing *Blau v. Leman*, 368 U.S. 403 (1962); *U.S. v. Cleveland Trust Co.*, 392 F. Supp. 699 (N.D. Ohio 1974)). In discussing the Receiver's use of the term "de facto director" here, I do not intend any reference to, or to engender any confusion with, the cases in which "de facto director" means "one who is in possession of and exercising the powers of that office *under claim and color of an election*, although he is not a director De jure and may be removed by proper proceedings." *Prickett v. Am. Steel & Pump Corp.*, 253 A.2d 86, 88 (Del. Ch. 1969) (emphasis added); *see also Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 459-60 (Del. Ch. 2012). The theory the Receiver advances in this regard has nothing to do with the line of cases dealing with disputed elections and contested board seats.

[122] 8 *Del. C.* § 141(b).

[123] *See, e.g.*, *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).

44

unexculpated conduct on his part. Kantner further contends that, as a director, he was entitled to rely on the Auditor Defendants and Wilmington Trust, and is therefore protected from liability under Section 141(e).[124] Because neither of those contentions is conclusive at this preliminary stage, I deny Kantner's motion to dismiss Count 11.

The crux of the Complaint's allegations against Kantner relate to a claim for failure of oversight, on a *Caremark* theory of liability.[125] Directors can be liable on *Caremark* grounds for: (1) utterly failing to implement any reporting or information system or controls; or (2) consciously failing to monitor or oversee such a system, thereby disabling themselves from being informed of risks or problems requiring their attention.[126] In either situation, oversight liability requires "a showing that the directors knew that they were not discharging their fiduciary obligations," resulting in a breach of the duty of loyalty for failure to act in good faith.[127] Proving liability under the *Caremark* line of cases "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[128]

The Complaint contains sufficient non-conclusory factual allegations for it to be reasonably conceivable that Kantner ultimately may be liable on this theory. Kantner's

---

[124] Wilm. Trust Opening Br. 34-39; Wilm. Trust Reply Br. 31-33.

[125] Receiver's Answering Br. to Wilm. Trust 48-60; *see In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).

[126] *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[127] *Id.*

[128] *In re Caremark*, 698 A.2d at 967.

45

tenure as a director of the SPI Entities covered each of the February 2009 Meetings, the October 2009 Meetings, and the 2010 Meetings, at which the entities' boards approved the audited financial statements with little or no substantive discussion, despite warnings that significant irregularities occurred and the companies' procedures needed to be changed. In terms of oversight, I note first that, based on the allegations in the Complaint regarding those events, I do not consider it reasonably conceivable that Kantner could be liable on grounds that he utterly failed to implement a monitoring or reporting system for the SPI Entities. The boards of the SPI Entities authorized the retention of Wilmington Trust and the Auditor Defendants to provide such a monitoring mechanism.

Whether I reasonably can infer from the Complaint that Kantner consciously disregarded a known duty to oversee that monitoring system depends on how I view the Significant Matters Letter, in which Johnson Lambert indicated to the boards that Johnson Lambert met with considerable difficulty in preparing the 2007 Audited Financial Statements, including several extraordinary balance discrepancies in the SPI Entities' accounts. The Receiver urges me to conclude that the Letter included "red flags" and that the directors' failure to follow up on those concerns reasonably could amount to a conscious disregard of their oversight responsibilities. Kantner, on the other hand, contends that, because the Significant Matters Letter implied that remedial actions had been taken and the Jackson Letter suggested that the problems were "not considered material," he and the other directors were justified in relying on the Auditor Defendants' representations and not inquiring further into the issues.

46

That argument might hold water as to some of the directors, but it reasonably could be inferred from the allegations in the Complaint that Kantner, as an employee of Wilmington Trust, actually knew or constructively knew more about the seriousness of the problems Wilmington Trust and the Auditor Defendants were having with Jackson. The Complaint is replete with allegations that Drost, Theriault, and others at Wilmington Trust had actual notice of the fact that something material was amiss with Jackson and his purported financial information. Their extensive dealings with the mysterious "Alpesh" are just one example of Wilmington Trust's awareness of Jackson's highly unorthodox business practices. The picture that emerges from the facts alleged is that Jackson's conduct did not pass the sniff test. Nevertheless, Wilmington Trust and the Auditor Defendants allegedly held their noses and looked the other way in order to get the audits finished, file the paperwork, collect their fees, and move on.

The Complaint further supports an inference that Drost, Theriault, or some other person at Wilmington Trust, consistent with Wilmington Trust's internal policies or common sense business practices, shared their misgivings with Kantner. The Complaint conceivably also could support the opposite inference—that that information never made its way to Kantner, because, for example, Drost and Theriault worked in Wilmington Trust's Vermont office, while he was in Delaware. I cannot say, however, that such a contrary inference is the only reasonable inference that could be supported by the Receiver's allegations. At the motion to dismiss stage, it would be improper to make that leap, as Kantner urges me to do. I therefore conclude that, regardless of whether the Significant Matters Letter and the Jackson Letter would have misled one or more

47

directors into thinking that all was well at the SPI Entities, Kantner was positioned differently than the others by virtue of his position as Accounting Manager at Wilmington Trust and its designated director on the SPI Entities' boards.[129]

The Complaint contains numerous allegations about Kantner's colleagues' repeated, and largely unsuccessful, attempts to get Jackson to provide information, or sign a form, or set up a call with the elusive "Alpesh," or provide direct access to the bank accounts. A reasonable inference can be drawn from the Complaint—and at this stage, I am required to draw such inferences—that Kantner was made aware of these problems through communications with Drost or Theriault, discussions made all the more likely because of Kantner's position as the statutorily required "resident director" on the SPI Entities' boards. Yet, Jackson apparently went about his fraudulent scheme year after year, while the Board unquestioningly approved the annual audited financial statements and failed to follow up on the suggested operating procedure improvements. Kantner allegedly went along without raising a peep. In their reliance on Jackson, Wilmington Trust, the Auditor Defendants, Kantner, and the other directors may have

---

[129]    *See* 18 *Del. C.* § 6906(f) ("In the case of a captive insurance company . . . [f]ormed as a corporation, at least 1 of the members of the board of directors or other governing body shall be a resident of, or have that member's principal place of business in, this State . . ."); *id.* § 6903(b) (requiring a Delaware captive insurance company, *inter alia*, to maintain its principal place of business in this State, and hold at least one board meeting per year here); *see also* Compl. ¶¶ 7, 74.

been overly supine.[130]  Taking all allegations in the Complaint as true, however, Kantner's disengagement conceivably could amount to a conscious disregard of his duties based on what he reasonably may be assumed to have known about the SPI Entities' deficiencies.  As a result, I consider it reasonably conceivable that Kantner knowingly disregarded his oversight responsibility, and thereby subjected himself to potential liability on a *Caremark* claim.  Thus, I deny his motion to dismiss that aspect of the Complaint.

### E.      Claims for Breach of Contract, Negligence, and Aiding and Abetting

Unlike claims for a breach of fiduciary duty, claims for breach of contract, negligence, and aiding and abetting arguably may be subject to the defense of *in pari delicto*.  In this section of the Opinion, I take up the Moving Defendants' contention that *in pari delicto* bars those claims as a matter of law.  After reviewing the *in pari delicto* doctrine under Delaware law and concluding that it may provide a bar, I examine whether any of the exceptions to that doctrine could apply here and enable the relevant claims to go forward.

#### 1.      *In pari delicto*

##### a.      Basics of the doctrine

*In pari delicto* is an affirmative defense by which "'a party is barred from recovering damages if his losses are substantially caused by activities the law forbade

---

[130]    I express no opinion as to the potential *Caremark* liability of any of the SPI Entities' directors other than Kantner, because only Kantner is before me on the pending motions to dismiss.

49

him to engage in.'"[131] The doctrine provides that rather than adjudicating a suit by one wrongdoer against her counterpart, courts will "'leave them where their own acts have placed them.'"[132] *In pari delicto* serves at least two important policy goals: deterring wrongful conduct by refusing wrongdoers any legal or equitable relief, and protecting the judicial system from having to use its resources to provide an accounting among wrongdoers.[133] Thus, courts have recognized that the rule "'is adopted, not for the benefit of either party and not to punish either of them, but for the benefit of the public.'"[134] Like most American jurisdictions, Delaware embraces this venerable doctrine.[135]

Although the literal translation is "in equal fault," courts have eschewed a strict requirement that the party asserting the defense demonstrate that the degree of his fault is the same as or less than that of the party against whom he asserts it. The rule therefore has been held to apply "to situations more closely analogous to those encompassed by the 'unclean hands' doctrine, where the plaintiff has participated 'in some of the same sort of

---

[131]  *AIG II*, 976 A.2d at 883 (quoting *In re LJM2 Co–Inv., L.P.,* 866 A.2d 762, 775 (Del. Ch. 2004)).

[132]  *Id*. at 882 (quoting AM. JUR. 2d *Actions* § 40).

[133]  *Id*. at 882 n.21; *see also, e.g.*, *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985); *Stone v. Freeman*, 82 N.E.2d 571, 572 (N.Y. 1948) ("[N]o court should be required to serve as paymaster of the wages of crime, or referee between thieves.")

[134]  *AIG II*, 976 A.2d at 882 n.21 (quoting *Lewis v. Davis,* 199 S.W.2d 146, 151 (Tex. 1947)); *see also* 3 POMEROY, *supra* note 103, § 940 n.5.

[135]  *AIG II*, 976 A.2d at 882.

wrongdoing' as the defendant."[136]  For that reason, *in pari delicto* may be raised against a plaintiff wrongdoer even if that plaintiff "was led into a path of crime by one more culpable."[137]  Moreover, because the main purpose of *in pari delicto* would be undermined by fact intensive proceedings comparing the culpability of the wrongdoers, the defense may be raised successfully on a motion to dismiss, unless the complaint is devoid of grounds for invoking the rule.[138]

As relevant here, *in pari delicto* applies to bar claims between wrongdoers regardless of whether the plaintiff wrongdoer is a natural person or a corporation.  A basic tenet of corporate law, derived from principles of agency law, is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their

---

[136]     *Pinter v. Dahl*, 486 U.S. 622, 632 (1988).  In this regard, I note that the full rendition of the legal maxim, *in pari delicto potior est conditio defendentis*, has been translated as, "In a case of equal or mutual fault, the position of the defending party is the better one." *Berner*, 472 U.S. at 306.  It is the mutuality of fault that gives the doctrine its logical force; if emphasis were to be placed on the equality or relative degree of fault, the court probably would have to find facts and engage in a balancing analysis that would defeat the purpose of having the rule in the first place. *See AIG II*, 976 A.2d at 883-34.  "'[H]ypertechnical interpretation of the *in pari delicto* doctrine is outdated' as 'it is not necessary that [the] wrongdoing of plaintiff and defendant be clearly mutual, simultaneous, and relatively equal.'" *In re Oakwood Homes Corp.*, 389 B.R. 357, 371-72 (D. Del. 2008) (quoting *Peltz v. SHB Commodities, Inc.,* 115 F.3d 1082, 1090 (2d Cir. 1997)), *aff'd*, 356 F. App'x 622 (3d Cir. 2009)).

[137]     1 AM. JUR. 2D *Actions* § 40; *see also Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010).

[138]     S*ee, e.g., AIG II*, 976 A.2d at 878; *Oakwood Homes Corp.*, 389 B.R. at 372.

authority, are imputed to the corporation itself.[139]  Delaware law adheres to this general

rule of imputation—of holding a corporation liable for the acts and knowledge of its

agents—even when the agent acts fraudulently or causes injury to third persons through

illegal conduct.[140]  Though at superficial level it may appear harsh to hold an "innocent"

corporation (and, ultimately, its stockholders) to answer for the bad acts of its agents,

such "corporate liability is essential to the continued tolerance of the corporate form, as

any other result would lack integrity."[141]  These considerations are central to the *in pari*

*delicto* doctrine: the practice of imputing officers' and directors' knowledge to the

corporation means that, as a general rule, when those actors engage in wrongdoing, the

corporation itself is a wrongdoer.[142]  As such, the company generally is barred from

stating a legal or equitable claim against a third party that participated in the scheme of

wrongdoing.

### b.    Exceptions to the rule

A principal, however, is not presumed to have knowledge of or be liable for the

actions of an agent that abandons the principal's interests.[143]  Likewise, corporations have

---

[139]    *See, e.g.*, *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at \*11 (Del. Ch. Aug. 26, 2005).

[140]    *See In re Brandywine Volkswagen, Ltd.*, 306 A.2d 24, 27 (Del. Super.), *aff'd sub nom. Brandywine Volkswagen, Ltd. v. State Dep't of Cmty. Affairs & Econ. Dev.*, 312 A.2d 632 (Del. 1973).

[141]    *AIG II*, 976 A.2d at 893.

[142]    *Id*. at 883-84.

not been held to the general rule of *in pari delicto* "when the corporate agent responsible for the wrongdoing was acting *solely to advance his own personal financial interest*, rather than that of the corporation itself."[144] This departure from the general rule of imputation, known as the "adverse interest exception," is one of three major ways that courts adhering to the traditional *in pari delicto* rule have avoided application of the doctrine in a specific context.

The adverse interest exception, if applied correctly, should cover only the "unusual" case in which the allegations support a reasonable inference of "the type of total abandonment of the corporation's interests" that is characteristic of, for example, outright stealing from the corporation.[145] Because most instances of fraud or illegal misconduct by corporate actors confer at least some benefit on the corporation, the adverse interest exception may not apply even when the "benefit" enjoyed by the corporation is outweighed by the long-term damage that is done when the agent's mischief comes to light.[146] Nevertheless, where agents act purely in pursuit of their own interest to the detriment of the principal to whom they owe fiduciary duties, the societal interest in deterring such action is strong enough that the policies underlying the *in pari*

---

[143] *Id*. at 891 n.50.

[144] *Id.* at 891 (emphasis added).

[145] *Id*. at 891 (citing *In re CBI Hldg. Co.,* 529 F.3d 432, 453 (2d Cir. 2008)).

[146] *AIG II*, 976 A.2d at 892.

53

*delicto* doctrine give way and the acts and knowledge of the faithless agent are not imputed to the corporation.

Deciding when a countervailing public policy should trump the policies animating *in pari delicto* often proves difficult. The *in pari delicto* doctrine has manifest appeal in the classic case of, for example, a thief who is injured in commission of a crime; it would be absurd to allow him to sue a co-felon who stole the injured thief's share of the loot, or the burglarized homeowner whose negligent maintenance caused a slip-and-fall.[147] When the rule is invoked against a corporation attempting to sue a party that previously joined in or facilitated its wrongdoing, however, the policy rationale of the case can be less clear-cut. A prototypical instance involves "innocent" stockholders bringing suit derivatively on behalf of the corporation to recoup some of the losses caused by the fraudulent actions of its officers and directors, who may well have been removed from the company already. While equitable considerations may not come into play in the case of the plaintiff thief, they might in the case of the corporation-as-derivative-plaintiff—or, as relevant here, the receiver of entities driven to insolvency by faithless fiduciaries— because innocent stockholders or creditors may gain or lose depending on the way the doctrine is applied.

That specific concern animates a second carve-out from *in pari delicto*: the fiduciary duty exception. Under that exception, perhaps the most expansive, the doctrine

---

[147]    *Cf. Kirschner*, 938 N.E.2d at 950.

has no force in a suit by a corporation against its own fiduciaries.[148] Although various

rationales have been advanced as supporting this exception,[149] the underlying justification

is that parties like receivers, trustees, and stockholder derivative plaintiffs must be able to

act on the corporation's behalf to hold faithless directors and officers accountable. "To

hold otherwise would be to let fiduciaries immunize themselves through their own

wrongful, disloyal acts,"[150] a "transparently silly" result.[151] The fiduciary duty exception

to the *in pari delicto* doctrine ensures that stockholders (and, in cases of insolvent

entities, creditors) have a remedy for the wrongdoing that caused them harm. That

consideration is paramount in a court of equity, such as this Court, which "will suffer no

wrong without a remedy."[152] The existence of the fiduciary duty exception, therefore, re-

frames the fundamental inquiry involved in deciding whether to apply *in pari delicto* or

---

[148] *AIG II*, 976 A.2d at 876, 889-95.

[149] *Id.* at 889-90; *see also In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1107 (Del. Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004).

[150] *AIG II*, 976 A.2d at 876.

[151] *HealthSouth Corp.*, 845 A.2d at 1107.

[152] 2 POMEROY, *supra* note 103, § 363. This maxim "is the source of the entire equitable jurisdiction, exclusive, concurrent, and auxiliary." *Id.* at § 423. The doctrine of *in pari delicto*, of course, implicates another of our first principles— that "he who comes into equity must come with clean hands." *Id.* at §§ 363, 397. *Cf. Seacord v. Seacord*, 33 Del. 485, 139 A. 80, 81 (Del. Super. 1927) (discussing "the rule of pari delicto or the equitable maxim, 'He who comes into court must come with clean hands'").

set it aside: the issue is "not whether stockholders can seek relief on the corporation's behalf, but from whom stockholders can seek that relief."[153]

A similar rationale underlies a third category of cases in which courts have avoided *in pari delicto*, even where by its terms it would apply: *i.e.*, the exception that applies "when another public policy is perceived to trump the policy basis for the doctrine itself."[154] Cases falling under this seemingly diffuse "public policy exception" are united by fact patterns involving statutory schemes like the federal securities laws that rely in significant part on private causes of action for their enforcement.[155] In such instances where the claim at issue directly furthers an established policy, courts may defer to that policy by setting *in pari delicto* aside and allowing the action to go forward.

### c. *AIG I* and *AIG II*—the leading Delaware cases on *in pari delicto*

Because it is the central authority on which the parties rely for their statement of the *in pari delicto* doctrine in Delaware, and because it is perhaps easiest to envision the doctrine's application by way of example, I review briefly this Court's decisions in *In re*

---

[153]  *AIG II*, 976 A.2d at 889.

[154]  *Id*. at 888.

[155]  *See Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 136 (1968) (reversing lower federal court rulings that "seemed to threaten the effectiveness of the private action as a vital means for enforcing the antitrust policy of the United States"); *see also Pinter*, 486 U.S. at 633 (stating that, in the context of the federal securities laws, courts must ensure that "judge-made law" like *in pari delicto* "does not undermine the congressional policy favoring private suits as an important mode of enforcing federal securities statutes"); *Berner*, 472 U.S. at 315.

*American International Group, Inc. Consolidated Derivative Litigation*.[156] That action

arose out of a wide-ranging array of financial misconduct by several high-level officers

and directors of American International Group, Inc. ("AIG"). In particular, it was alleged

that AIG's Chairman and CEO, Maurice R. Greenberg, and several of his top lieutenants

orchestrated a series of transactions designed to inflate AIG's perceived financial

strength, engaged in illegal schemes to avoid taxes, sold illegal financial products to other

companies, and conspired with competitors to rig certain insurance markets.[157] When the

various schemes were discovered, AIG had to restate years' worth of its financials, which

ultimately resulted in a reduction of the stockholders' equity of $3.5 billion.

Additionally, the company was forced to pay nearly $2 billion to resolve various criminal

and civil proceedings lodged against it.[158]

Certain stockholders, derivatively on AIG's behalf, brought a litany of claims

against various defendants.[159] Greenberg, his inner circle of corporate officers, and

multiple directors and employees of AIG were sued for, among other things, breaches of

fiduciary duty. The derivative complaint also leveled claims for fraud, conspiracy, and

---

[156]     *AIG I*, 965 A.2d 763; *AIG II*, 976 A.2d 872.

[157]     *See AIG I*, 965 A.2d at 782-94.

[158]     *Id*. at 793-94.

[159]     *Id*. at 775-76. Consistent with the decision of a special litigation committee of the AIG board, AIG itself also became a plaintiff in the litigation to pursue direct claims for breach of fiduciary duty against Greenberg and another officer. *See id*. Unless otherwise noted, all claims discussed in this section pertain to the derivative aspects of the *AIG I* and *AIG II* decisions.

aiding and abetting against General Re Corporation ("Gen Re"), with which AIG had engaged in several illegal transactions designed to misrepresent the strength of AIG's insurance reserves.[160] In connection with AIG's scheme to rig bids in an insurance brokerage market, the derivative complaint further included counts for fraud and conspiracy against Marsh & McLennan Companies, Inc. ("Marsh"), ACE Limited ("ACE"), and an ACE executive; Marsh additionally was sued for aiding and abetting a breach of fiduciary duty and for unjust enrichment.[161] Finally, the derivative plaintiffs sued PricewaterhouseCoopers LLP ("PwC"), AIG's independent auditor, for breach of contract and malpractice, on the theory that they wrongly had certified AIG's financial statements as accurate and GAAP-compliant, when they ultimately had to be restated by billions of dollars.[162]

In *AIG I*, Chief Justice Strine, then writing as Vice Chancellor, addressed motions to dismiss filed by the AIG defendants—Greenberg and his inner circle, and several former and current AIG employees—and PwC.[163] The Court dismissed the claims against the employee defendants on personal jurisdiction grounds, but largely refused to dismiss the claims against Greenberg and his top lieutenants.[164] Although it was not

---

[160] *AIG II*, 976 A.2d at 879.

[161] *Id.* at 880-81.

[162] *AIG I*, 965 A.2d at 776.

[163] *Id.*

[164] *Id.* at 795-815.

discussed in *AIG I*, a necessary predicate of that aspect of the opinion was the fact that, as corporate officers and directors who owed fiduciary duties to AIG and its stockholders, none of those defendants were able to invoke the *in pari delicto* defense.[165]

More pertinent to this Opinion, however, was the treatment in *AIG I* of PwC's motion to dismiss. In that regard, the complaint asserted that PwC committed malpractice and breached its contract with AIG by failing to discover widespread fraud that occurred at the upper levels of AIG management, and that AIG suffered greater losses than it would have if PwC's auditing had conformed to generally accepted auditing standards ("GAAS"). PwC invoked the defense of *in pari delicto*, arguing that AIG was a wrongdoer in that situation, and because the claim was AIG's—even if pursued derivatively on its behalf by various stockholders—the company was barred from stating a claim against a fellow wrongdoer under the law of New York, which PwC claimed governed. The choice of law issue was addressed first. Relying on the most significant relationship test, the Court agreed that New York law governed AIG's claims against PwC.[166]

After reviewing the applicable New York precedent relating to *in pari delicto*, the Court concluded that, if it were to apply the *in pari delicto* doctrine as the New York Court of Appeals likely would, AIG's derivative claims against PwC would be barred by the rule of imputation. It also determined that the narrow adverse interest exception

---

[165] *AIG II*, 976 A.2d at 876.

[166] *AIG I*, 965 A.2d at 818-22.

could not be invoked because the complaint suggested that the alleged wrongdoing of Greenberg and other AIG officials had not been committed solely for the benefit of the insiders themselves.[167] AIG itself had benefitted from the financial machinations of the insiders' fraud, even if those benefits turned out to be short-lived once the misconduct came to light.[168] Thus, *in pari delicto* applied, and the claims against PwC were dismissed.

In reaching that decision, then-Vice Chancellor Strine expressed discomfort with the result of New York's rule, and two aspects of his *obiter dictum* comments in that regard are particularly relevant to this case. First, he indicated that, if PwC had been accused of aiding and abetting a breach of fiduciary duty, his choice of law determination might have been different.[169] Because of Delaware's "paramount" interest in policing alleged breaches of fiduciary duties within Delaware corporations, he posited that the gravity of a claim for aiding and abetting such a breach potentially could trump another state's interest in adjudicating issues of professional misconduct according to its own laws.[170] Second, then-Vice Chancellor Strine stated that, even as to AIG's breach of contract and malpractice claims against PwC, if Delaware law were applicable, he

---

[167]     *Id.* at 823-30.

[168]     *Id.*

[169]     *Id.* at 822.

[170]     *Id.*

60

"would be chary about following the New York approach."[171] In so doing, he questioned some of the assumptions that appeared to underlie the rationale of New York's *in pari delicto* doctrine as it presumably would apply to corporate advisors like PwC.

Two further aspects of the *AIG* litigation are noteworthy here. After this Court's decision in *AIG I*, the Delaware Supreme Court certified to the New York Court of Appeals (the "New York Court") the issue of whether, under New York law, the *in pari delicto* defense was effective to bar AIG's derivative claims against PwC.[172] In *Kirschner v. KPMG LLP*, the New York Court answered that question and a closely related one arising out of an action in the federal courts of the Second Circuit.[173] As to both questions, the Court upheld New York's strict *in pari delicto* rule by refusing to adopt a contrary position advocated by the stockholder derivative plaintiffs in *AIG I* and the analogous position of a litigation trustee in a bankruptcy action. In so ruling, the New York Court explicitly declined "to alter our precedent relating to in pari delicto, and imputation and the adverse interest exception, as we would have to do to bring about the expansion of third-party liability sought by plaintiffs here."[174]

Finally, in *AIG II*, the Court of Chancery addressed motions to dismiss brought by Gen Re, Marsh, and ACE. As discussed above, those defendants were subject to claims

---

[171] *Id.* at 828 n.246.

[172] *Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers, LLP*, 998 A.2d 280 (Del. 2010).

[173] 938 N.E.2d 941, 945 (N.Y. 2010).

[174] *Id.*

61

on behalf of AIG for fraud, conspiracy, and aiding and abetting breaches of fiduciary duty. Notably, in ruling on the motions to dismiss, then-Vice Chancellor Strine applied Delaware law. He concluded that Delaware's *in pari delicto* defense applied to bar AIG from stating claims against any of those three alleged co-conspirators.[175] In reaching that decision, the Court rejected two arguments that the derivative plaintiffs advanced to avoid the *in pari delicto* doctrine. First, as a factual matter, the Court ruled that the allegations in the complaint reasonably could support an inference that AIG was "in equal fault" with the co-conspirators as to the alleged fraudulent transactions.[176]

Second, the Court held that, as a matter of Delaware law, there was no policy justification for setting aside the *in pari delicto* doctrine to allow a corporation guilty of wrongdoing to sue its alleged co-conspirators.[177] In this regard, it found unpersuasive the derivative plaintiffs' argument that because the stockholders themselves had done nothing wrong, it would be unjust to prevent them from recouping some of their losses. The Court observed that accepting that line of reasoning "would eviscerate the in pari delicto doctrine and contravene the policy judgments upon which that doctrine rests."[178]

The Court noted that the AIG stockholders already had the benefit of the major exception to the *in pari delicto* rule: the ability to sue corporate insiders, such as directors

---

[175]     *Id*. at 882, 895.

[176]     *Id*. at 885-88.

[177]     *Id*. at 888.

[178]     *Id*. at 889.

and officers whose actions precipitated the claimed losses, on behalf of the company. "The issue," it stated, "is therefore not whether stockholders can seek relief on the corporation's behalf, but from whom stockholders can seek that relief."[179] Allowing stockholders to expand this exception, however, by suing parties "outside of the borders of their corporation would not be socially useful."[180] The important policy considerations animating the *in pari delicto* doctrine—principally, sparing the court from wasting its resources to provide an accounting among wrongdoers—would be severely undermined by allowing the kind of claims brought by the derivative plaintiffs to go forward. As for the purported benefits of setting aside the rule, the Court observed that companies like Gen Re, Marsh, and ACE needed little added incentive to follow the law, based on "the potent public enforcement that exists as to many important laws that regulate" such businesses.[181]

## 2. The question presented here, and the relevant contentions

In summary, Delaware law adheres to the doctrine of *in pari delicto*, and where it applies, the doctrine precludes the court from hearing claims as between wrongdoers unless the wrongdoer-plaintiff against whom it is invoked can avail herself of an exception to the rule. Guided by the foregoing principles, my analysis of this issue as it pertains to the present motions consists of asking: first, should *in pari delicto* apply to the

---

[179]    *Id.*

[180]    *Id.*

[181]    *Id.* at 895 n.59.

Receiver's claims against Wilmington Trust and the Auditor Defendants? And if so, is there an exception that would save those claims from dismissal?

In this regard, the Moving Defendants contend that the doctrine applies here, because the alleged misconduct of the SPI Entities' fiduciaries—most clearly, Jackson—is imputed to the SPI Entities, making them at least substantially equal in fault to the Moving Defendants. They contend that even though the Receiver has brought this action on behalf of the SPI Entities and their stakeholders, she has only the rights of, and is subject to the same defenses as, the SPI Entities themselves. Finally, the Moving Defendants argue that no exception to the doctrine is available to prevent the dismissal of the SPI Entities' claims.

The Receiver challenges all three of those contentions. In particular, she asserts that the well-established adverse interest exception applies here. The Receiver also contends that *in pari delicto* should not apply because this case involves an insurance liquidation receivership action. Thus, for the public policy reasons embodied in Delaware's insurance statute and related regulations, she argues that this Court should decline to apply the general rule of imputation by which *in pari delicto* operates to bar claims. Finally, she maintains that, even if *in pari delicto* applies and the adverse interest exception is unavailable, Delaware law should not permit an auditor to invoke the doctrine, because of the special role auditors play in informing corporate fiduciaries. I discuss these issues in turn.

At the outset, however, I note that, by the Complaint's own terms, the SPI Entities bear "substantially equal responsibility"[182] for the alleged schemes by which money was stolen from the policyholders and the DDOI was misled about the SPI Entities' true financial condition. For example, the Complaint accuses James M. Jackson of fraud, and takes issue with the Moving Defendants' failure to detect and prevent that fraud. It is clear, however, that the relevant actions in this regard were taken on behalf of the SPI Entities, so that they could obtain the DDOI's approval to operate as captive insurers.[183] Thus, the general doctrine of *in pari delicto* applies to bar the SPI Entities' claims against the Moving Defendants, unless the Receiver can avail herself of some exception to that doctrine.[184]

### 3.   Can the Receiver avail herself of the adverse interest exception to the *in pari delicto* doctrine?

The Receiver contends that, even if it applies, *in pari delicto* does not bar the claims against the Moving Defendants because she may take advantage of the "adverse interest exception." As discussed above, this exception is derived from the same body of agency law imputation principles that gave rise to the *in pari delicto* rule itself.[185] That

---

[182]    *See AIG II*, 976 A.2d at 883; *Berner*, 472 U.S. at 310.

[183]    *See, e.g.*, Compl. ¶¶ 56, 62-70, 78, 94-95, 102, 263-66.

[184]    The Receiver does not seriously contend that the SPI Entities do not bear fault for their present situation, but rather advances several exceptions that she argues should apply here to preclude the Moving Defendants' *in pari delicto* defense. I address those arguments in the next sections.

[185]    *See supra* notes 143-146; *see also* RESTATEMENT (THIRD) OF AGENCY § 5.03 cmt.b (2006).

is, in a case where the agent's action is totally adverse to the interests of his principal, the law will not impute knowledge of the bad act to the principal, because it seems nonsensical to presume that a thieving agent would tell his principal about the theft.[186] In the corporate context, and as relevant here, where a corporate fiduciary acts "solely to advance his own personal financial interest, rather than that of the corporation itself," the adverse interest exception comes into play and permits the corporation to state a claim against the faithless fiduciary's co-conspirator.[187] This type of total abandonment, such as siphoning corporate funds or other outright theft, is likely to be a "highly unusual case."[188] Thus, the adverse interest exception is applied narrowly, lest it be expanded to the point of covering more terrain than the rule itself.[189] As a result, the exception will not enable a party to avoid application of *in pari delicto* if the illegal scheme furthers both the faithless fiduciary's interests and those of the corporation itself.[190]

---

[186] *See* RESTATEMENT (THIRD) OF AGENCY § 5.04 ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person.")

[187] *AIG II*, 976 A.2d at 891.

[188] *Id.*

[189] *Id.* at 894.

[190] *Id.* at 892-94 (holding that the traditional, narrow approach to the adverse interest exception was the correct statement of Delaware law); *see also Kirschner*, 15 N.Y.3d at 466-67, 938 N.E.2d 941, 952 (noting that the traditional, narrow formulation of the adverse interest exception "avoids ambiguity where there is a benefit to both the insider and the corporation," and therefore is suitable only where the insider's misconduct benefits only himself or a third party).

On the facts of this case, the adverse interest exception is unlikely to save the Receiver's claims. The allegations in the Complaint conceivably could support a reasonable inference that at least Jackson was involved in siphoning money from the SPI Entities' bank accounts, which could be the sort of total adversity required to sustain the exception. Another equally plausible reading of the Complaint, however, is that there never was any money in the bank accounts during the relevant time periods, but rather that the entire structure was a sham. Because this action is before me on motions to dismiss, I must draw all reasonable inferences in favor of the Receiver. Accordingly, I assume that at some point during the relevant time period, at least Jackson stole funds from the SPI Entities' accounts.

While Jackson's alleged theft is indicative of an intent to act "to advance his own personal financial interest," the Complaint also suggests that his activities furthered the SPI Entities' interests. The Complaint is replete with allegations that, if not for the misrepresented financial statements, the SPI Entities never would have been authorized as Delaware-domiciled captive insurers. This may have been a temporary benefit, which proved illusory once the fraud came to light, but it is clear from the face of the Complaint that the SPI Entities' position was improved, if only for a time, by Jackson's machinations.[191]

---

[191] *Cf. Kirschner*, 938 N.E.2d at 953 ("Consistent with these principles, any harm from the discovery of the fraud—rather than from the fraud itself—does not bear on whether the adverse interest exception applies. . . . If that harm could be taken into account, a corporation would be able to . . . disclaim virtually every corporate

Even if I were to assume that Jackson completely had abandoned the SPI Entities'

interests and that those entities obtained no benefit from his conduct, however, the

Receiver still cannot invoke the adverse interest exception in the circumstances of this

case. The reason is because the SPI Entities are subject to an exception to the adverse

interest exception—the "sole actor" exception.[192] Courts have applied the sole actor

exception where the agent committing the fraud was the sole stockholder of the

corporation, or otherwise "dominated" the corporation.[193]

As discussed above, the adverse interest exception is based on the presumption

that a completely faithless agent would not communicate his knowledge to his principal,

and that the principal would not benefit from the agent's adverse action. The sole actor

rule overrides the adverse interest exception where the principal and the agent are the

same, because it is absurd to presume that the one actor involved and affected somehow

could keep secrets from himself, and because the principal, as the same sole owner,

benefits from the fraud.[194] Thus, in the corporate context, where a high-level officer or

---

fraud—even a fraud undertaken for the corporation's benefit—as soon as it was discovered and no longer helping the company.").

[192] *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 359 (3d Cir. 2001).

[193] *Id.* at 359-60; *see also In re Jack Greenberg, Inc.*, 212 B.R. 76, 86 (Bankr. E.D. Pa. 1997).

[194] *See, e.g.*, *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997); RESTATEMENT (THIRD) OF AGENCY § 5.04 cmt.d (2006) ("[I]f the agent controls the principal's decisionmaking, the principal is charged with notice of the agent's wrongdoing.

director also solely owns or otherwise dominates the corporation, the principal-agent distinction virtually disappears. In terms of a claim against a third party that dealt with the corporation, therefore, the adverse interest exception will not aid an agent-principal who does wrong by protecting the corporation he controls from the effect of *in pari delicto*.

In this case, Jackson was at all relevant times the President and Chairman of Security Pacific, SPI-202, SPI-203, and SPI-204, and held 100 percent of those companies' stock.[195] The Receiver does not dispute that Jackson solely owned and dominated the SPI Entities. Rather, she contends that the sole actor rule should not apply here because of the nature of the insurance business, in which policyholders and the public at large have a stake in the solvency of insurers. According to the Receiver, it therefore would be unjust for this Court to presume that there is a "complete unity of interest between a sole stockholder who loots his own insurance company and the company itself."[196] Taken to its extreme, this would mean that the existence of policyholders and other innocent creditors in the insurance context should cause the adverse interest exception to apply and avoid the *in pari delicto* doctrine, because the

---

This rule, often termed the 'sole actor doctrine,' treats principal and agent as one.").

[195] Compl. ¶¶ 30, 44, 96. *See* Receiver's Answering Br. to Auditor Defs. 2-3, 42.

[196] Receiver's Answering Br. to Auditor Defs. 43 (quoting *Reider v. Arthur Andersen, LLP*, 784 A.2d 464, 474 (Conn. Super. Ct. 2001) (refusing to use the sole actor rule to override the adverse interest exception, and allowing the state insurance commissioner to bring claims against liquidated insurer's former auditor)).

fraudulent corporate insider was acting adversely to the public's interests, even if not to those of the corporation's owners.[197]

That reasoning, if accepted, would mean that the *in pari delicto* defense cannot apply to any case in which the claims are being asserted by an insurance company, either in receivership or as a derivative plaintiff. I cannot square such a result with the decision in *AIG II*, which involved one of the most systemically important insurance companies in the world.[198] For that reason, I reject the Receiver's attempt to avoid application of the "sole actor" rule.[199] I therefore conclude that the adverse interest exception—even if it

---

[197] *Cf. Reider*, 784 A.2d at 474-75 ("Therefore, when a sole owner seeks to loot his own insurance company, every person with a legally protected interest in the insurer's continuing solvency is *not* a knowing and willing participant in the owner's fraud. Like an innocent minority shareholder whose interests in a corporation are harmed by a conspiracy of the other shareholders . . . the public is an innocent stake holder in the solvency of the insurer."). This type of argument was expressly rejected in *AIG II* because it would make *in pari delicto* a dead letter. *AIG II*, 976 A.2d at 893 ("[A]n innocent insider exception, like the plaintiffs' personal interest exception, would allow corporations to sue their own co-conspirators for actions that were undertaken, at least in part, for the corporation's own interest, giving corporations rights that natural persons do not have.")

[198] *AIG II* involved *in pari delicto* defenses raised by third-party co-conspirators, not auditors, and is there somewhat distinct from the claims against the Moving Defendants in this case. Nevertheless, if Delaware embraced the type of "innocent stakeholder" exception the Receiver urges in this regard, it would gut the *in pari delicto* defense regardless of who was raising it. I address in the next Section the specific arguments regarding whether auditors should be treated differently than other defendants.

[199] In addition to the holding *AIG II*, at least two other reasons support this conclusion. First, insurance companies are not the only companies that are relied on by their customers and creditors, nor are they unique in being systemically important. Because similar considerations apply to many regulated industries

70

conceivably could apply, which is dubious based on the allegations of the Complaint—

cannot be invoked here because of the sole actor rule.

**4.**      **Should *in pari delicto* be set aside on grounds that its application would frustrate an established public policy of this State?**

As discussed above, while courts generally will refuse to hear claims as between wrongdoers, "that rule has always been regarded by courts of equity as without controlling force in all cases in which public policy is considered as advanced by allowing either party to sue for relief against the transaction."[200] The Receiver's contention in this regard is twofold: (1) that receivers are not, or should not be, barred by the *in pari delicto* defense; and (2) that important public policy interests are served by the Receiver here, in the specific context of insurance liquidation. I do not find either contention persuasive.

I begin with the suggestion that because the Receiver is innocent of wrongdoing when she "steps into the shoes" of the liquidated entities, she cannot be subject to the defenses to which the entities themselves would be subject. If accepted, this principle would eviscerate *in pari delicto*. In the typical case in which the doctrine plausibly is

---

(*e.g.*, financial institutions, food and drug companies, utilities, railroads, and aviation, etc.), the purportedly "unique" or narrow carve-out urged here easily could sweep much of the economy within its ambit. Second, I note again that the innocent parties involved here are not without remedy. The issue again is "not whether [they] can seek relief on the corporation's behalf, but from whom [they] can seek that relief." *AIG II*, 976 A.2d at 889.

[200]      *AIG II*, 976 A.2d at 888 n.43 (quoting *Seacord v. Seacord*, 33 Del. 485, 139 A. 80, 81 (Del. Super. 1927)).

invoked, it is because faithless corporate insiders committed misconduct that an innocent party later wished to disavow in order to state a claim on behalf of the corporation. By definition, if the insiders' fraud were ongoing, the innocent claimant either would not have discovered the misconduct yet, or the entity in question might not yet have become insolvent. Sometimes, it is stockholder derivative plaintiffs who bring claims in the name of the corporation after an insider's wrongdoing is discovered and, often, the bad actor or actors have been removed from their position. In other situations, a receiver or trustee may bring claims on behalf of the delinquent or bankrupt entity. In either case, it is tempting to view the innocent claimant as the true plaintiff and to set aside the *in pari delicto* doctrine so as to allow the claim to be brought. As a Vice Chancellor, Chief Justice Strine heard essentially identical arguments in *AIG II*, however, and he rejected them.[201] The same reasoning applies with equal force here. I see no cogent reason for sparing the innocent Receiver the effect of *in pari delicto* while equally innocent stockholders or policyholders would be barred from relief in the derivative context.[202]

---

[201] *AIG II*, 976 A.2d at 889 ("According to the plaintiffs, in such situations the traditional rule is unjust because the stockholders themselves did not act wrongfully, and therefore the traditional in pari delicto rules should be set aside so that the corporation can be made whole and thus the economic interests of the innocent stockholders can be protected. But, the exceptions that the plaintiffs request would eviscerate the in pari delicto doctrine and contravene the policy judgments upon which that doctrine rests.")

[202] I reject as unpersuasive the suggestion that parties like trustees or receivers should be able to avoid *in pari delicto* and similar defenses merely because they do not "voluntarily step" into the shoes of the defunct entity, but rather are "thrust into" those shoes. *See F.D.I.C. v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995). Stockholder derivative plaintiffs are no less "thrust into" a position of having to

72

Nor is the avoidance of *in pari delicto* supported by the Receiver's appeal to the public policy interests extant in the context of insurance company delinquency generally, or that of captive insurance companies in particular. As the Receiver points out, insurance is a heavily regulated industry in Delaware and every other state. An entire title (Title 18) of the Delaware Code governs insurance companies, and an entire chapter therein is devoted to captive insurers.[203] Pursuant to the Insurance Code, the State has vested the Insurance Commissioner with significant authority to enforce the relevant law and its corresponding administrative regulations.[204]

There are strong reasons for creating and maintaining a robust regulatory framework regarding insurance. In general, the "reach of influence and consequence" of insurance companies have long been considered "beyond and different from that of the

---

bring suit on behalf of an entity betrayed by its fiduciaries. Further, the idea that the party raising *in pari delicto* "enjoys a windfall," *id.*, misses the point of the doctrine—sparing the court from becoming entangled in claims between wrongdoers. *See* 3 POMEROY *supra* note 103, § 940 n.5. In any case, it is not clear that *O'Melveny & Myers* stands for a proposition that is helpful to the Receiver. *See, e.g.*, *In re Imperial Corp. of Am.*, 92 F.3d 1503, 1509 (9th Cir. 1996) (clarifying that *O'Melveny* does not mean that "equitable defenses can never be asserted against FDIC acting as a receiver"); *In re Bartoni-Corsi Produce, Inc.*, 130 F.3d 857, 862 (9th Cir. 1997) (clarifying that *O'Melveny* was focused on "the question of *fiduciary* liability," and finding *O'Melveny* inapposite in the context of determining whether a third party non-fiduciary is liable to a corporation) (emphasis added).

[203]    *See* 18 *Del. C.* §§ 101 to 8412 (the "Insurance Code"); *id.* §§ 6901 to 6983 (relating to captive insurers).

[204]    *See id.* §§ 301 to 333.

ordinary business."[205]   As relevant to this case, Delaware has a particularly significant interest in regulating insurance companies domiciled here, whose assets purportedly exceed $500 billion in the aggregate, making the Department of Insurance the largest consumer protection agency in the state.[206]   All these considerations buttress the proposition that the public has an interest in keeping insurers solvent and in overseeing or facilitating the orderly disposition of insolvent or delinquent ones.

Accepting the Receiver's premise, however, does not lead inexorably to the conclusion she urges.  For starters, the claims subject to the pending motions to dismiss are the SPI Entities' claims, not the Insurance Commissioner's.   Moreover, even setting that aside, the expansive and intricate statutory and regulatory framework governing Delaware-domiciled insurance companies arguably cuts *against* the Receiver's position that *in pari delicto* should not apply, not in favor of it.  The essence of her argument is that, if I decline on the basis of public policy to allow Wilmington Trust and the Auditor Defendants to invoke the *in pari delicto* defense, the State's policy goals will be furthered in two ways: (1) the Moving Defendants, if ultimately held liable, can contribute to making the SPI Entities' innocent policyholders whole; and, (2) the Commissioner can incentivize better behavior on the part of firms providing management and auditing services to captive insurers.

---

[205]   *German Alliance Ins. Co. v. Lewis*, 233 U.S. 389, 414 (1914).

[206]   *Karen Weldin Stewart – Biography*, DEL. DEPT. OF INS. (last accessed Mar. 23 2015), http://www.delawareinsurance.gov/bio.shtml.

74

As discussed above, the proper inquiry in considering whether to apply the "public policy" exception to *in pari delicto*—which itself serves important public policy objectives—is whether "preclusion of suit would not significantly interfere with the effective enforcement" of a statutory policy scheme.[207] In the case of Delaware insurance regulation, however, no private enforcement scheme exists; to the contrary, the DDOI has been given significant authority to achieve the goals of making innocent insurance policyholders whole, and deterring bad conduct on the part of firms providing professional services to insurers.[208] The statute does not suggest that the Legislature intended private causes of action to play a part in its enforcement,[209] and the Receiver has not cited any case law indicating otherwise.

In this regard, I also note that, with respect to *captive* insurance companies specifically, the Commissioner has even broader authority: in addition to the numerous reporting and minimum capitalization requirements noted in Section I.B *supra*, captive insurance companies are required to select from among audit firms and "captive

---

[207] *See Berner*, 472 U.S. at 311; *Pinter*, 486 U.S. at 635.

[208] *See, e.g.*, 18 *Del. C.* § 318 (Commissioner may examine any Delaware insurance company in her sole discretion); *id*. § 319 (same as to insurance agents, brokers, and the like).

[209] *See, e.g.*, *id*. § 313 (granting the Commissioner broad authority to institute proceedings through the Attorney General to enforce "any order or action" of the Commissioner, and to refer criminal violations of the insurance code to the Attorney General).

managers" that are pre-approved by the Insurance Commissioner.[210]  In other words, if the misconduct in this case is deemed to be grave enough, the Commissioner presumably could impose some sort of administrative sanction against Wilmington Trust, Johnson Lambert, or McSoley McCoy, or, perhaps, even remove one or more of them from the list of pre-approved service providers.

If the Commissioner is unable to achieve what she deems appropriate levels of consumer protection and industry deterrence, she has been delegated the authority to promulgate further regulations consistent with the insurance statute.[211]  Finally, if the statutory tools thus far granted to the DDOI are insufficient, it is the province of the Delaware General Assembly, not this Court, to provide a tailored solution, in a process open to all relevant stakeholders and capable of balancing the numerous, and sometimes competing, considerations democratically.

For all of the foregoing reasons, I am not convinced that public policy would be better served by preventing defendants from relying on the defense of *in pari delicto* merely because the commercial backdrop is that of insurance.  Indeed, because of the highly regulated nature of insurance in this State, I do not consider it appropriate to undermine the policies advanced by the *in pari delicto* doctrine, when the purported benefits of doing so here appear to be achievable within the robust regulatory framework that already exists.

---

[210]     18 Del. Admin. C. §§ 302-2.4, 302-4.2.

[211]     18 *Del. C.* § 311.

**5.** **Should Delaware law recognize a common law "auditor exception" to *in pari delicto*?**

At this point in my analysis, the imputation of Jackson's knowledge and actions to the SPI Entities is presumed, and *in pari delicto* applies to bar the Receiver from asserting the SPI Entities' claims, unless I accept the Receiver's final argument in favor of a special "auditor exception" to the doctrine. In asking this Court to recognize an "auditor exception" to the *in pari delicto* doctrine, the Receiver seeks adoption of her interpretation of the dictum in *AIG I* to the effect that, were he able to address the applicability of *in pari delicto* to bar AIG's claims against PwC under Delaware law, then-Vice Chancellor Strine may not have applied the doctrine. Viewing the dictum in *AIG I* in context with the rest of Delaware corporate case law, I do not read our precedent as supporting the broad carve-out from *in pari delicto* that the Receiver urges. I do agree, however, with the sentiment voiced in *AIG I* and *AIG II* that auditors are different from genuine third parties when it comes to analyzing whether *in pari delicto* should apply, and they ought not be afforded the protection of that rule based on a rote application of agency law principles. As those considerations relate to the particular facts of this case, I conclude, for the reasons that follow, that the claims against Wilmington Trust and the Auditor Defendants for breach of contract and negligence must be dismissed. I decline to dismiss, however, the claims against those Defendants for aiding and abetting breaches of fiduciary duty.

Before focusing on Delaware law, I note that several states have created specific exceptions from *in pari delicto* to allow corporations claims' against auditors to proceed.

77

For example, in *NCP Litigation Trust v. KPMG LLP*, the Supreme Court of New Jersey held that a liquidation trustee was not barred from bringing a negligence claim against an auditor whose alleged negligence contributed to the damages caused by the fraud of the liquidated corporation's insiders.[212] The court placed limitations on the holding in *NCP Litigation Trust*, however. Specifically, an auditor retains the right to raise the "imputation defense," as it is called there, against a stockholder who had participated in the fraud, or defendants who by reason of their role in the company should have known about the fraud but did not, or stockholders whose stake in the company was large enough that they should have been able to exercise some oversight over company operations.[213] Because the *NCP* rule is intended to allow "only 'innocent' shareholders to recover," the court expressly noted that the assessment of relative fault in this regard is a factual question that generally requires development of the factual record through discovery and trial.[214]

The Supreme Court of Pennsylvania also responded to a fact pattern involving alleged auditor participation in corporate insiders' fraud by qualifying its *in pari delicto* doctrine, although it took a slightly different tack.[215] There, the Pennsylvania Court

---

[212] 901 A.2d 871, 882-83 (N.J. 2006).

[213] *Id*. at 885-86.

[214] *Id*.; *see also id*. at 886 n.3.

[215] *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PricewaterhouseCoopers, LLP*, 989 A.2d 313 (2010) [hereinafter "*AHERF*"].

based its determination of whether the insiders' fraud should be imputed to the corporation to bar claims against co-wrongdoers (including auditors) on a test of good faith. That is, while imputation generally applies under Pennsylvania law, the court precluded reliance on the *in pari delicto* defense by an auditor that "has not dealt materially in good faith with the client-principal," with the goal of foreclosing application of the doctrine in "scenarios involving secretive collusion between officers and auditors to misstate corporate finances to the corporation's ultimate detriment."[216]

As noted above, the Court of Appeals of New York in *Kirschner* strictly adhered to the traditional *in pari delicto* defense. The discussions and reasoning contained in the *NCP Litigation Trust*, *AHERF*, and *Kirschner* decisions are enlightening on this issue, but none of them are controlling, nor do I consider their logic dispositive of the issue before me.

a.      **Neither the case law nor public policy support a blanket "auditor exception" to *in pari delicto***

The Receiver asks this Court to interpret Delaware's formulation of the *in pari delicto* doctrine as not applying to any claims against auditors. In making that argument, she relies on: (1) *AIG I* and *AIG II*; and (2) policy-based reasoning.[217] I am not persuaded that either the rationale of the *AIG* decisions or general policy considerations support such a sweeping exception to *in pari delicto*.

---

[216]     *Id*. at 339.

[217]     Receiver's Answering Br. to Auditor Defs. 37-41.

First, as the Receiver correctly notes, *AIG I* does suggest that Delaware law should approach on its own terms the question of whether auditors can raise *in pari delicto*, and not mechanically follow the approach of New York or any other state. When read alongside *AIG II*, as it must be, however, the rationale of *AIG I* does not support veering to the opposite extreme by entirely setting aside *in pari delicto* to allow any and all claims against auditors. The *AIG I* opinion observes, for example, that "one can quibble with [the New York approach] while still having doubt about the public policy utility of exposing audit firms to uncapped liability for their negligent failure to detect financial fraud by corporate managers."[218] In that vein, then-Vice Chancellor Strine briefly noted that "a more thoughtful tact" would not involve simply allowing any and all causes of action against auditor defendants to proceed, but rather would seek responsibly to calibrate the auditors' *ex post* liability through the use of heightened standards of pleading, liability, and proof, and damages caps.[219] In that regard, the Court noted in *AIG I* that "[a]lthough audit fees are lucrative, they arguably pale in comparison to the potential liability the auditors face," and going too far in the direction of imposing *ex post* liability can backfire.[220]

---

[218] *AIG I*, 965 A.2d at 828 n.246.

[219] *Id*.

[220] *Id*.; *see also id.* ("The even larger disproportion between independent directors fees and liability inspired § 102(b)(7) as well as the gross negligence standard Delaware corporate law applies in cases when a § 102(b)(7) clause does not apply. One can therefore understand the concern about the need to keep the auditor industry healthy, or to avoid the possibility that audit firms will suffer huge

Moreover, in deciding which law applied in *AIG I*, the Court expressly considered the Delaware public policy interests that could have been furthered by refusing to apply New York law (and possibly precluding PwC from asserting the *in pari delicto* defense).[221] The Court ultimately concluded, however, that those considerations do not trump our choice-of-law principles and the policy goals they protect. To the extent the Receiver relies on *AIG I* as supporting the proposition that all other policy interests must yield to the benefits that arguably flow from precluding auditors from raising the *in pari delicto* defense, I find that reliance misplaced.

Second, I question the policy arguments the Receiver makes in favor of a broad exception to *in pari delicto* for any and all claims against auditors. A theme of the Receiver's argument in this case, and in decisions like *AHERF* and *NCP*, is that allowing *in pari delicto* to bar claims against auditors essentially would subvert two policy goals in that: (1) innocent stockholders and creditors who were harmed would be deprived of a remedy for that harm; and (2) auditor misconduct, either knowing or negligent, would go unpunished. I consider both of those contentions misguided.

With the first, a flawed premise is disguised by noble sentiment. For starters, *in pari delicto* only acts to bar claims that in fact belong to the corporation, so it would not

---

verdicts by fact-finders desirous of holding anyone they can liable for a fraud-based corporate meltdown or whose judgment about the auditor's capability to have detected the fraud through the use of professional diligence is compromised by hindsight bias.").

[221] *Id*. at 821-22.

preclude a stockholder or creditor who suffered a *direct* harm from bringing a direct claim to redress it. Even in cases where it might apply, however, *in pari delicto* will not bar the corporation from suing its faithless fiduciaries, because of the fiduciary duty exception. Thus, the corporation has at least some remedy for wrongs done and a source for recoupment of its losses.

Even if concern for innocent stockholders were considered the most important factor, however, making the defense of *in pari delicto* unavailable to auditor defendants would be problematic. Adopting such a rule would mean that a wrongdoer-corporation gets to sue its auditor and cause the innocent residual claimants of that firm to bear the cost of the lawsuit and any damages, while residual claimants of true third-party co-conspirators (like Gen Re, Marsh, or ACE in *AIG II*) would enjoy the protection of *in pari delicto*. The imbalance of such a rule is especially pronounced where the audit firm is allegedly negligent, while the corporation's fiduciaries and the agents of the third-party co-conspirators are accused of purposefully engaging in fraud.

A second main policy contention proffered by the Receiver—that carving out an auditor exception from *in pari delicto* would undermine efforts to encourage auditors to do a better job monitoring—takes a blinkered view of the world. It is one thing to accept the premise that our corporate law should not automatically dismiss on *in pari delicto* grounds all claims against auditors in cases involving serious corporate misconduct. It is a significant leap, however, to conclude from that premise that the best policy answer is to open a floodgate of *ex post* auditor liability.

82

The independent auditor undoubtedly plays a central role in effectuating important public policies implicated in corporate law, such as investor protection, efficient capital markets, and good corporate governance. Auditors are so central, in fact, that there are numerous governmental and non-governmental bodies currently regulating and otherwise overseeing the audit industry.[222] Thus, to the extent it is suggested that the blunt instrument of ex-post liability in contract or tort will cause auditors to do their jobs better, it is questionable whether this Court would have much to add in this already well-covered field. The best-case scenario is that the Court adequately understands and applies the

---

[222] Depending on who their client is, for example, auditors are subject to "authoritative" standard-setting by, among others: the Federal Accounting Standards Advisory Board; the Financial Accounting Standards Board; the Governmental Accounting Standards Board; the Public Company Accounting Oversight Board ("PCAOB"); the International Accounting Standards Board; and the International Auditing and Assurance Standards Board, in addition to the relevant boards and committees of the American Institute of CPAs, such as the Auditing Standards Board. *See Authoritative Standards*, AM. INST. OF CERTIFIED PUBLIC ACCOUNTANTS (last accessed Mar. 23, 2015), http://www.aicpa.org/Publications/AuthoritativeStandards/Pages/AuthoritativeSta ndards.aspx. *See also* 15 U.S.C.A. § 7211(c) (conferring upon the Securities and Exchange Commission ("SEC") the power to register and inspect public accounting firms, issue rules governing public company audits, investigate and discipline registered auditors, and otherwise "enforce compliance" with Sarbanes-Oxley, PCAOB rules, professional standards, and the federal securities laws); John C. Coffee, Jr., *Gatekeeper Failure and Reform: The Challenge of Fashioning Relevant Reforms*, 84 B.U. L. REV. 301, 336-37 (2004). This structure of audit regulation does not disappear as the focus narrows from the national level and public companies to the particular facts of this case. In Delaware, as in presumably most states, the legislature has created a State Board of Accountancy to protect the public from incompetent auditing. 24 *Del. C.* § 101. That Board has the power to develop standards assuring professional competence, monitor and adjudicate complaints brought against practitioners, promulgate rules and regulations, and impose sanctions where necessary.

applicable audit standards and generally accepted accounting principles ("GAAP") equally as well as the relevant regulatory body whose core jurisdiction such issues fall under. Even if the Court succeeds at that endeavor, the results—from the perspective of auditor monitoring and deterrence—ideally should be duplicative. Thus, the benefits in terms of auditor deterrence would likely be more limited than the Receiver suggests.

For those reasons, I find that the purported benefits (in terms of investor protection and auditor deterrence) of creating an exception to *in pari delicto* for all claims against auditors are not sufficient to justify undermining the policy principles girded by the doctrine, which protect the Court from accounting among wrongdoers. In addition to the lack of persuasive benefits associated with that kind of sweeping exception, some negative outcomes likely would flow from it. In that regard, one consideration is whether it makes sense for a court of equity to purport to place itself on the level of, for example, the SEC, the PCAOB, the AICPA, or the State Board of Accountancy in terms of evaluating the performance of auditors. With respect to monitoring auditors, the experience and sophistication of those or other relevant audit and accounting regulatory bodies is beyond that of law-trained judges, and their capacity to govern the audit industry is appropriate for the scale of that endeavor. In my view, this Court should avoid entangling itself unnecessarily in time- and resource-consuming inquiries about whether GAAP and relevant audit standards were met, which would be the foreseeable outcome if, for example, *in pari delicto* did not bar contract and negligence claims in cases like this one. Because regulatory bodies exist for conducting such inquiries, I

84

consider it ill-advised to insert this Court into matters within the core mandate of those bodies.

### b. Well-pled aiding and abetting claims against defendants like auditors should not be barred by *in pari delicto*

Although the *AIG* decisions and the public policy considerations just discussed do not point to a sprawling exception from *in pari delicto* for any and all claims against auditors, they do support a more limited exception grounded in both the nature of the claim asserted and the party likely to raise *in pari delicto* to bar that claim. As discussed, Delaware law sets aside *in pari delicto* when a receivership trustee or derivative plaintiff seeks to sue the corporation's own fiduciaries for breach of their fiduciary duties. Applying the same reasoning, I conclude that Delaware law should do the same where an auditor or similar defendant is alleged to have aided and abetted such breach. Rather than create an expansive new "auditor exception" to *in pari delicto*, therefore, I determine that the fiduciary duty exception extends to cover well-pled aiding and abetting claims against defendants like auditors. Thus, in this case, the claims against the Wilmington Trust and the Auditor Defendants for breach of contract and negligence will be barred by *in pari delicto*, but the claims against them for aiding and abetting breaches of fiduciary duty will not.

Both *AIG I* and *AIG II* recognize that defendants like auditors should be treated differently than other third parties when it comes to *in pari delicto*. *AIG I* also made the nuanced observation that claims against a defendant like PwC for aiding and abetting a breach of fiduciary duty would be materially different from breach of contract or

85

negligence claims against PwC. Then-Vice Chancellor Strine placed "an important caveat" on his decision not to apply Delaware law in *AIG I*, observing that had the stockholder derivative plaintiffs there stated claims against PwC for aiding and abetting breaches of fiduciary duty, his choice of law analysis might have been "quite different."[223] But "[b]ecause PWC only face[d] claims for malpractice and breach of contract, rather than claims that it consciously aided wrongful managerial misconduct," he applied New York law and ultimately dismissed all claims as New York law required him to.[224]

I agree that claims for aiding and abetting breaches of fiduciary duty differ materially from contract and negligence claims, because with the former, the corporation's internal affairs are the focus of the claim.[225] The policy goals advanced by *in pari delicto*, while important enough to outweigh this Court's interest in adjudicating breaches of contract and negligence claims at the periphery of a corporation's affairs,

---

[223] *AIG I*, 965 A.2d at 822.

[224] *Id*.

[225] The elements for establishing such a claim are well known: (1) a fiduciary relationship; (2) breach of the fiduciary's duty; (3) knowing participation in the breach by the alleged aider-and-abettor; and (4) causation of damages. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001). In this regard, I note that, because of the significant overlap in their respective elements, much of the evidence for proving an aiding and abetting claim already would be coming in to prove the breach of fiduciary duty claim under the fiduciary duty carve-out to *in pari delicto*. Claims for breach of an audit contract or for professional negligence involve little or no such salutary overlap, which both reinforces the fundamental difference in the nature of the claims, and adds a practical reason for drawing this distinction.

should not outweigh the importance of this Court's ability to adjudicate core fiduciary duty claims arising out of entities organized under Delaware law.

*AIG II* gives a further, equally critical insight, however: not all aiding and abetting claims are created equal. Thus, in *AIG II*, the Court applied Delaware law to dismiss aiding and abetting claims that the stockholder derivative plaintiffs sought to prosecute against the third-party co-conspirators (Gen Re and Marsh). The lack of analogous aiding and abetting claims was notable in *AIG I*, but that distinction was mentioned only in passing in *AIG II*.[226]

The distinction in the *AIG* cases between third parties like ACE, Gen Re, and Marsh on one hand and PwC on the other comports with the reality that non-fiduciaries like auditors, who occupy a position of trust and materially participate in the traditional insiders' discharge of their fiduciary duties, are different from other third parties with whom the corporation may transact business.[227] For purposes of the motions currently before me, I need not dilate upon this distinction, because it is evident from the face of the Complaint that both Wilmington Trust and the Auditor Defendants are alleged to

---

[226] *AIG II*, 976 A.2d at 879 ("[T]he plaintiffs have brought claims for fraud, conspiracy, and aiding and abetting a breach of fiduciary duty against Gen Re."); *id*. at 881 ("[T]he Complaint pleads counts of fraud and conspiracy against Marsh & McLennan, ACE, and Rivera, as well as counts of aiding and abetting a breach of fiduciary duty and unjust enrichment against Marsh.").

[227] *See AIG II*, 976 A.2d at 895; *see also id.* at 895 n.60 ("Suits against corporate agents like outside auditors are best conceived of as also within the confines of a single corporate conspirator and are consistent with the traditional acceptance of derivative suits against corporate insiders.").

87

have played a "gatekeeper" role vis-à-vis the SPI Entities. On that basis alone, the aiding and abetting claims against them are fundamentally unlike those that were dismissed in *AIG II*. I conclude, therefore, that *in pari delicto* does not provide grounds for dismissing the aiding and abetting claims against Wilmington Trust and the Auditor Defendants.

### c. The Complaint states claims for aiding and abetting breaches of fiduciary duty against Wilmington Trust and Johnson Lambert, but not McSoley McCoy

For the reasons stated in the preceding Sections, the Receiver's claims against Wilmington Trust and the Auditor Defendants for breach of contract and negligence are dismissed on grounds of *in pari delicto*, but the claims for aiding and abetting breaches of fiduciary duty are not. As I next discuss, the Complaint adequately states aiding and abetting claims as to Wilmington Trust and Johnson Lambert, but not as to McSoley McCoy.[228]

To survive a motion to dismiss, a complaint must allege facts that satisfy the four elements of an aiding and abetting claim: (1) the existence of a fiduciary relationship, (2)

---

[228] The Complaint purports to name Kantner as a Defendant in connection with the aiding and abetting claims in Count 12. Compl. ¶ 381. As discussed above, Kantner owes fiduciary duties to the SPI Entities by reason of his position as a director, and is accused of breaching those duties. Any conduct of Kantner's that conceivably might rise to the level of aiding and abetting a breach of fiduciary duty in this regard would simply be a further breach of Kantner's own duties. Accordingly, Count 12 is dismissed as to Kantner. *See, e.g.*, *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990); *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972); *see also Higher Educ. Mgmt. Gp., Inc. v. Mathews*, 2014 WL 5573325, at \*13 (Del. Ch. Nov. 3, 2014).

a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach.[229]

As to the existence of fiduciary duties, alleged breaches thereof, and resulting damages, the Complaint contains allegations sufficient to support a reasonable inference of two general types of breach, both amply discussed in this Opinion: (1) the purposeful fraud ascribed to James M. Jackson; and (2) the alleged failure on the part of at least the SPI Entities' director Kantner to exercise sufficient oversight, in breach of his duty of loyalty. Thus, as with most cases involving aiding and abetting liability, the sufficiency of the claims against the Moving Defendants in this regard "largely come[s] down to what constitutes 'knowing participation.'"[230] Specifically, the relevant inquiry is whether it is reasonably conceivable, based on the non-conclusory allegations in the Complaint and all reasonable inferences drawn from them, that Wilmington Trust, Johnson Lambert, and McSoley McCoy "knowingly participated" in either of the alleged breaches described in items (1) and (2) here.

At this preliminary stage of the litigation, I cannot rule out the possibility, based on the allegations in the Complaint, that Wilmington Trust and Johnson Lambert knowingly participated in James M. Jackson's fraudulent scheme in breach of his fiduciary duties. I need not decide that question for purposes of the pending motions to

---

[229] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[230] *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *15 (Del. Ch. Nov. 21, 1995).

89

dismiss the aiding and abetting claim, however, because it also is reasonably inferable that Wilmington Trust and Johnson Lambert knowingly participated in, at least, the breaches of fiduciary duty allegedly committed by the SPI Entities' other directors, in the critical sense that they "*created* the unreasonable process and informational gaps that led to the Board's breach of duty."[231]

Drost and Theriault of Wilmington Trust worked hand-in-glove with Handy and Bolton of Johnson Lambert to prepare the 2007 and 2008 Audited Financial Statements. Those processes were replete with alleged irregularities, and it is reasonable at this stage to infer that both Wilmington Trust and Johnson Lambert knew something was significantly wrong within the SPI Entities' operations. In one of the more glaring episodes detailed in the Complaint, after receiving bank account confirmations from Wachovia and Bank of America that widely diverged from the information provided by Jackson, Handy and Drost followed Jackson's instructions to talk to "Alpesh" in order to straighten things out. At one point, Drost and Handy actually discussed how strange it was that their given contact person for Wachovia bank was the same as for Wachovia Securities, in light of the strict separation of those units normally observed within Wachovia's structure. Drost knew something was wrong, or at least it is reasonably inferable that he did, when he stated "maybe, and hopefully [it was] OK" that "Alpesh" was the contact person for both. But Drost's disbelief was evident in his saying that they should try to contact both sides of the Wachovia structure to figure out why all of the

---

[231]     *In re Rural Metro*, 88 A.3d at 99.

huge discrepancies "suddenly" were explained away.[232] Lengthy and unexplained delays occurred, but were not challenged by Wilmington Trust or Johnson Lambert in trying to resolve this issue. When, months after he initially inquired, Bolton finally heard from "Alpesh," the explanation Alpesh gave did not convince either Bolton or Drost. Nevertheless, Drost concocted what he admitted was an "optimistic" re-interpretation of Alpesh's story, and on that basis he checked the final boxes and Wilmington Trust and Johnson Lambert marked the 2007 Audited Financial Statements complete, nearly a year after they set out to complete it.[233]

These alleged facts are only examples, and perhaps they and the numerous other relevant facts alleged in the Complaint conceivably could be explained away as negligence, or perhaps gross negligence, on the part of Wilmington Trust and Johnson Lambert. One instance where they conceivably cross the threshold of "scienter," however, is in connection with those entities advising the SPI Entities' Boards at the meetings in February and October 2009. Drost, Theriault, and (presumably) Kantner of Wilmington Trust were in attendance at those Meetings, at which the Johnson Lambert

---

[232] *See Compl.* ¶¶ 165-175.

[233] *Id.* ¶¶ 204-209. I note also that when he was briefing McSoley McCoy after they were retained for the 2009 audit, Drost said that in trying to call "Alpesh," he didn't "seem to have any success getting through, or even getting an opportunity to leave a message." *Id.* ¶ 287. That was in May 2010. After two full years of communicating with "Alpesh," Drost still had a hard time getting in touch with him. Drawing all inferences in favor of the Receiver on the pending motions to dismiss, I cannot rule out the possibility that, on the facts alleged, she could show that Wilmington Trust and Johnson Lambert knew that something about this was extremely suspicious.

audited financial statements were approved with little or no discussion. In connection with the February 2009 Meeting and the 2007 Audited Financial Statements, Johnson Lambert advised the directors in the Significant Matters Letters that the audit irregularities already had been addressed. The facts alleged in the Complaint, however, suggest that they knew otherwise—as evidenced, at least, by the fact that the same difficulties came up the following year. The Jackson Letter further suggested that certain procedures should be improved in connection with the bank account reconciliations. At a later point, Wilmington Trust advised Jackson that they wanted to have direct access to the bank accounts so that they could confirm balances without going through Jackson.

Those suggestions and requests were ignored by Jackson, but neither Wilmington Trust nor Johnson Lambert ever attempted to follow up with the other directors. Though the situation in terms of the audit irregularities apparently did not improve between the February 2009 Meeting and the October 2009 Meeting, Johnson Lambert did not send another Significant Matters Letter or otherwise update the Boards. It is reasonably inferable, therefore, that both Wilmington Trust and Johnson Lambert *knew* that the directors were not informing themselves and not exercising their oversight responsibility, when those Defendants arguably first presented the "significant matters" as being less of a problem than they actually were, and then allowed the directors to ignore the letters and the suggestions contained within them. This knowing lack of follow-up directly created the "unreasonable process" and "informational gaps" that are alleged to have led to the

92

Board's breaches of fiduciary duties. [234] Accordingly, I refuse to dismiss the claims asserted by the Receiver against Wilmington Trust and Johnson Lambert for aiding and abetting a breach of fiduciary duty.

The situation is materially different with respect to McSoley McCoy. It reasonably might be inferred that they conducted their audit process in a negligent or even grossly negligent manner because, like Johnson Lambert, McSoley McCoy apparently relied on the mysterious Alpesh, and unquestioningly accepted the forged fax copy of the confirmation form regarding the Key Man Policy without following up to obtain the original of that document from Hartford Life. But, McSoley McCoy entered the picture much later than Johnson Lambert, and the Complaint alleges that it largely followed the process that Wilmington Trust laid out as being "routine" for the SPI Entities' audits. The critical link in the factual allegations regarding Wilmington Trust and Johnson Lambert was their knowing failure to follow up on the original warnings they provided to the Board in connection with the first audit, despite experiencing very similar irregularities the next year. McSoley McCoy, however, was not around long enough to have engaged in such a dereliction of their responsibilities. Thus, the Complaint fails to allege sufficient facts as to McSoley McCoy to support a reasonable inference that it "knowingly" participated in the Board's alleged breaches of fiduciary duty. I therefore dismiss the aiding and abetting claim as it relates to McSoley McCoy.

---

[234] *Rural Metro*, 88 A.3d at 97-100.

93

## III. CONCLUSION

For the reasons stated in this Opinion, I dismiss the claims for breach of fiduciary duty against Wilmington Trust and the Auditor Defendants for failure to state a claim. The motion to dismiss the claim for breach of fiduciary duty against Kantner, however, is denied. The claims for negligence and breach of contract as to Wilmington Trust and the Auditor Defendants are dismissed on grounds of *in pari delicto*. I further conclude that the claims against those Defendants for aiding and abetting a breach of fiduciary duty are not subject to the *in pari delicto* defense, and that the claims in that regard against Wilmington Trust and Johnson Lambert are well-pled. Accordingly, I deny the motion to dismiss the aiding and abetting claims against Wilmington Trust and Johnson Lambert. I grant the motion of McSoley McCoy, however, to the extent it seeks dismissal of the aiding and abetting claim against it, because in that respect the Complaint fails to state a claim upon which relief could be granted.

In summary, I grant the motions to dismiss Counts 1 through 10. Count 11 is dismissed as to Wilmington Trust, but not as to Kantner.[235] I grant dismissal of Count 12 as to McSoley McCoy and Kantner, but not as to Wilmington Trust or Johnson Lambert.

**IT IS SO ORDERED**.

---

[235] Count 11 also accuses Defendants James M. Jackson, King, and Davis of breaching their fiduciary duties. As those Defendants are not before me on the pending motions to dismiss, Count 11 is not dismissed as it relates to them.